```
 1         IN THE UNITED STATES OF AMERICA

 2      EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

 3

 4

 5   EEOC NO. 160-A2-8082X

 6   ---------------------------------------

 7   MICHAEL ORR,

 8              Complainant,

 9

10   vs.

11

12   UNITED STATES MARSHAL SERVICE

13              Respondent.

14   ---------------------------------------

15

16              VOLUME I OF III

17

18         TUESDAY, August 17, 2004

19          9:30 a.m. to 6:00 p.m.

20

21   BEFORE:  THE HONORABLE ANA GONZALEZ

22   Equal Employment Opportunity Commission

23   525 F.D. Roosevelt Avenue, Suite 1202 San

24   Juan, Puerto Rico 00918
```

1          Wirshing said about chiefs coming and

2          going until we get one of our own and so

3          forth?

4    A.    Well, first off I took it as a comment

5          against continental Americans or people

6          of non-Puerto Rican background, and then

7          I -- but I also wanted to be totally

8          up-front and fair with the Marshal.  I

9          remember telling him right then, hey, if

10         I ever decide to go anywhere I'll let

11         you know.  I'll get you help.  I'll tell

12         you.

13   Q.    Now, was there a discussion with Mr.

14         Soto leaving the, Chief Soto leaving the

15         Puerto Rico District at that time?

16   A.    Not at that time, at least that I know

17         about.Was their any discussion of him

18         applying for positions?

19   A.    That's probably what brought it up, yes,

20         that he was applying for -- oh, I know

21         Chief Soto has applied for several

22         positions.  And I took it that, again,

23         that Chief Soto hadn't told him that he

24         had.

```
 1                    So I was trying to be
 2          frank with him and said, hey, if I do,
 3          I'll tell you.
 4   Q.    Did you feel challenged or threatened
 5          about what Marshal Wirshing said?
 6   A.    A hundred percent threatened, yes.
 7   Q.    Why so?
 8   A.    I took it that I wasn't "one of our
 9          own".
10   Q.    Now, did there come a point when Chief
11          Soto in fact it was determined that he
12          would leave for another job?
13   A.    Yes, or that news came out that he had
14          been selected for a different job.
15   Q.    And when the news came out that Mr. Soto
16          was going to leave for a different job,
17          what was your reaction to that?
18   A.    Well, it caught me flat-footed even
19          though maybe it shouldn't have.  I
20          wasn't aware of it.  And then I looked
21          at it as a good opportunity to put in
22          for the 15 position.
23   Q.    Did you inform Marshal Wirshing that you
24          were interested in putting in for the 15
```

Page 75

1          position?

2     A.   I did.

3     Q.   When did you do that?

4     A.   I did up a big memo on September 4th of

5          that year and sent it to him and said,

6          hey, I heard now that Chief Soto is

7          going to be leaving the District.  I

8          want the position.  I think I'm

9          qualified.  Here's why.  Pick me, pick

10         me.

11    Q.   I'm going to direct your attention to

12         Complainant's Exhibit 6 and ask you if

13         Complainant's Exhibit 6 is the memo that

14         you are referring to in which you

15         informed Marshal Wirshing in writing of

16         your interest in the vacancy, potential

17         vacancy.

18    A.   Yes, it is.

19    Q.   Turning your attention to page 1023 of

20         the exhibit, which is three pages from

21         the end, it says immediate plans and

22         professional at the top.

23    A.   Yes.

24    Q.   Did you describe here for Marshal

1        Wirshing what your professional and

2        personal goals were at the time?

3   A.   Yes.

4   Q.   And you had issues, family issues going

5        on in Michigan at the time, correct?

6   A.   We did, yes.

7   Q.   And so in the event that you could have

8        been transferred to Michigan that would

9        have been good for your professional

10       situation, correct?

11  A.   Yes.

12  Q.   But you also indicated here that you had

13       no intention of leaving Puerto Rico and

14       that you would like to be -- that you

15       would like to obtain the GS-15 position

16       in Puerto Rico, the chief's job,

17       correct?

18  A.   Yes.

19  Q.   And after you sent Exhibit 4 -- and you

20       indicated or did you indicate in here

21       that Chief Soto had accepted a position

22       in Washington, DC?

23  A.   Yes.

24  Q.   And is that the first sentence?

1          MR. LAZAR:  Just to clarify,

2     Exhibit 6.

3  Q.  Exhibit 6, yes, that's the first thing

4     that you informed him of in the memo on

5     the first page 1020, correct?

6  A.  Yes.

7  Q.  So after you provided this information

8     to Marshal Wirshing, did he ever write

9     back anything in writing regarding your

10    expression of interest in the 15?

11 A.  Not in writing or orally.

12 Q.  So not orally either?

13 A.  No.

14 Q.  And in speaking of orally, you did

15    indicate in Exhibit 6 that you'd like to

16    talk to Marshal Wirshing about the

17    issue, correct?

18 A.  Yes.

19 Q.  Now, did there come a time -- and at the

20    time that you wrote Exhibit 6 on

21    September 4, 1999, had you ever been to

22    the United States Virgin Islands?

23 A.  No.

24 Q.  And at that time had you ever given any

```
 1          consideration to attempting to be posted

 2          in the United States Virgin Islands?

 3   A.    No.

 4   Q.    And subsequent to September 4th, did you

 5          obtain information about a possible

 6          detail opportunity to the Virgin

 7          Islands?

 8   A.    No.

 9   Q.    Well, at some point did you obtain some

10          information?

11   A.    I did at some point.

12   Q.    How did you obtain information about the

13          Virgin Islands?

14   A.    Chief Soto called me and told me that a

15          supervisor who had been acting chief

16          over in the V.I. had passed away

17          suddenly and would I be interested in

18          getting some acting chief time.

19   Q.    And just so we can be clear about this,

20          was this something that you sought out

21          or something that came to you out of the

22          blue from Soto?

23   A.    Absolutely, completely, clearly in my

24          memory and at the time and the truth is
```

1        it came from Chief Soto.  I never sought

2        it out.  I had no idea really much of

3        anything about the Virgin Islands.

4  Q.  Who was Chief Soto's immediate superior

5        at the time in Puerto Rico?

6  A.  Marshal Wirshing.

7  Q.  And when Chief Soto asked you if you

8        were interested in this detail, did that

9        lead you to infer anything about Marshal

10       Wirshing's view of you going on detail?

11  A.  Sure, that he wanted me to go there.

12  Q.  Why would you infer that?

13  A.  He hadn't responded to my memo on the

14       4th and here Chief Soto is calling me.

15  Q.  Is Chief Soto -- does Chief Soto  or did

16       you note whether or not Chief Soto

17       frequently would carry out orders of

18       Marshal Wirshing?

19  A.  By all means, yes.

20  Q.  Was that essentially what his job duties

21       were?

22  A.  Yes.

23  Q.  When Chief Soto contacted you about the

24       potential detail, did you -- what was

1      your reaction to that?  Did that idea

2      appeal to you or not appeal to you?

3   A.  At the time I had never thought about

4      it.  And I asked him, well, what do you

5      think?  And he said, hey, call the

6      Marshal over there and see what it's

7      like.  And it would be a good

8      opportunity for acting chief time.

9   Q.  And did you do that?

10  A.  I did.

11  Q.  And did you ascertain that you would

12     have an opportunity to be an acting

13     chief in the U.S. Virgin Islands?

14  A.  Not right away but --

15  Q.  At some point?

16  A.  Yes, at some point; yes.

17  Q.  And was that position -- what grade was

18     that position?

19  A.  A 14 position.

20  Q.  But it was different from the position

21     in Puerto Rico because it was a chief's

22     position; is that right?

23  A.  Right.

24  Q.  So did there come a point when you were

1          formally offered the detail in the

2          Virgin Islands?

3     A.   Yes.

4     Q.   And did Marshal Wirshing express to you

5          any views about -- directly himself any

6          views as to whether you should go to the

7          Virgin Islands?

8     A.   No.

9     Q.   One way or the other he didn't say

10          anything to you?

11    A.   No.

12    Q.   Did Marshal Wirshing have to approve in

13          order for you to go on the detail to the

14          Virgin Islands?

15    A.   By all means, yes.

16    Q.   And so he formally approved of it,

17          correct?

18    A.   Yes.

19    Q.   But did you speak to him personally

20          about it?

21    A.   Again he did not respond even to my

22          request for acting chief time in Puerto

23          Rico.

24    Q.   Now, once you were prepared to be sent

Page 73

```
1          Wirshing said about chiefs coming and

2          going until we get one of our own and so

3          forth?

4    A.    Well, first off I took it as a comment

5          against continental Americans or people

6          of non-Puerto Rican background, and then

7          I -- but I also wanted to be totally

8          up-front and fair with the Marshal.  I

9          remember telling him right then, hey, if

10         I ever decide to go anywhere I'll let

11         you know.  I'll get you help.  I'll tell

12         you.

13   Q.    Now, was there a discussion with Mr.

14         Soto leaving the, Chief Soto leaving the

15         Puerto Rico District at that time?

16   A.    Not at that time, at least that I know

17         about.Was their any discussion of him

18         applying for positions?

19   A.    That's probably what brought it up, yes,

20         that he was applying for -- oh, I know

21         Chief Soto has applied for several

22         positions.  And I took it that, again,

23         that Chief Soto hadn't told him that he

24         had.
```

1                    So I was trying to be

2          frank with him and said, hey, if I do,

3          I'll tell you.

4     Q.   Did you feel challenged or threatened

5          about what Marshal Wirshing said?

6     A.   A hundred percent threatened, yes.

7     Q.   Why so?

8     A.   I took it that I wasn't "one of our

9          own".

10    Q.   Now, did there come a point when Chief

11         Soto in fact it was determined that he

12         would leave for another job?

13    A.   Yes, or that news came out that he had

14         been selected for a different job.

15    Q.   And when the news came out that Mr. Soto

16         was going to leave for a different job,

17         what was your reaction to that?

18    A.   Well, it caught me flat-footed even

19         though maybe it shouldn't have.  I

20         wasn't aware of it.  And then I looked

21         at it as a good opportunity to put in

22         for the 15 position.

23    Q.   Did you inform Marshal Wirshing that you

24         were interested in putting in for the 15

1      position?

2   A.  I did.

3   Q.  When did you do that?

4   A.  I did up a big memo on September 4th of

5       that year and sent it to him and said,

6       hey, I heard now that Chief Soto is

7       going to be leaving the District.  I

8       want the position.  I think I'm

9       qualified.  Here's why.  Pick me, pick

10      me.

11  Q.  I'm going to direct your attention to

12      Complainant's Exhibit 6 and ask you if

13      Complainant's Exhibit 6 is the memo that

14      you are referring to in which you

15      informed Marshal Wirshing in writing of

16      your interest in the vacancy, potential

17      vacancy.

18  A.  Yes, it is.

19  Q.  Turning your attention to page 1023 of

20      the exhibit, which is three pages from

21      the end, it says immediate plans and

22      professional at the top.

23  A.  Yes.

24  Q.  Did you describe here for Marshal

```
 1          Wirshing what your professional and

 2          personal goals were at the time?

 3     A.   Yes.

 4     Q.   And you had issues, family issues going

 5          on in Michigan at the time, correct?

 6     A.   We did, yes.

 7     Q.   And so in the event that you could have

 8          been transferred to Michigan that would

 9          have been good for your professional

10          situation, correct?

11     A.   Yes.

12     Q.   But you also indicated here that you had

13          no intention of leaving Puerto Rico and

14          that you would like to be -- that you

15          would like to obtain the GS-15 position

16          in Puerto Rico, the chief's job,

17          correct?

18     A.   Yes.

19     Q.   And after you sent Exhibit 4 -- and you

20          indicated or did you indicate in here

21          that Chief Soto had accepted a position

22          in Washington, DC?

23     A.   Yes.

24     Q.   And is that the first sentence?
```

1          MR. LAZAR:  Just to clarify,

2      Exhibit 6.

3   Q.  Exhibit 6, yes, that's the first thing

4      that you informed him of in the memo on

5      the first page 1020, correct?

6   A.  Yes.

7   Q.  So after you provided this information

8      to Marshal Wirshing, did he ever write

9      back anything in writing regarding your

10      expression of interest in the 15?

11  A.  Not in writing or orally.

12  Q.  So not orally either?

13  A.  No.

14  Q.  And in speaking of orally, you did

15      indicate in Exhibit 6 that you'd like to

16      talk to Marshal Wirshing about the

17      issue, correct?

18  A.  Yes.

19  Q.  Now, did there come a time -- and at the

20      time that you wrote Exhibit 6 on

21      September 4, 1999, had you ever been to

22      the United States Virgin Islands?

23  A.  No.

24  Q.  And at that time had you ever given any

1       consideration to attempting to be posted

2       in the United States Virgin Islands?

3   A.  No.

4   Q.  And subsequent to September 4th, did you

5       obtain information about a possible

6       detail opportunity to the Virgin

7       Islands?

8   A.  No.

9   Q.  Well, at some point did you obtain some

10      information?

11  A.  I did at some point.

12  Q.  How did you obtain information about the

13      Virgin Islands?

14  A.  Chief Soto called me and told me that a

15      supervisor who had been acting chief

16      over in the V.I. had passed away

17      suddenly and would I be interested in

18      getting some acting chief time.

19  Q.  And just so we can be clear about this,

20      was this something that you sought out

21      or something that came to you out of the

22      blue from Soto?

23  A.  Absolutely, completely, clearly in my

24      memory and at the time and the truth is

Page 79

1    it came from Chief Soto.  I never sought

2    it out.  I had no idea really much of

3    anything about the Virgin Islands.

4    Q.  Who was Chief Soto's immediate superior

5        at the time in Puerto Rico?

6    A.  Marshal Wirshing.

7    Q.  And when Chief Soto asked you if you

8        were interested in this detail, did that

9        lead you to infer anything about Marshal

10       Wirshing's view of you going on detail?

11   A.  Sure, that he wanted me to go there.

12   Q.  Why would you infer that?

13   A.  He hadn't responded to my memo on the

14       4th and here Chief Soto is calling me.

15   Q.  Is Chief Soto -- does Chief Soto  or did

16       you note whether or not Chief Soto

17       frequently would carry out orders of

18       Marshal Wirshing?

19   A.  By all means, yes.

20   Q.  Was that essentially what his job duties

21       were?

22   A.  Yes.

23   Q.  When Chief Soto contacted you about the

24       potential detail, did you -- what was

1       your reaction to that?  Did that idea

2       appeal to you or not appeal to you?

3   A.  At the time I had never thought about

4       it.  And I asked him, well, what do you

5       think?  And he said, hey, call the

6       Marshal over there and see what it's

7       like.  And it would be a good

8       opportunity for acting chief time.

9   Q.  And did you do that?

10  A.  I did.

11  Q.  And did you ascertain that you would

12      have an opportunity to be an acting

13      chief in the U.S. Virgin Islands?

14  A.  Not right away but --

15  Q.  At some point?

16  A.  Yes, at some point; yes.

17  Q.  And was that position -- what grade was

18      that position?

19  A.  A 14 position.

20  Q.  But it was different from the position

21      in Puerto Rico because it was a chief's

22      position; is that right?

23  A.  Right.

24  Q.  So did there come a point when you were

1          formally offered the detail in the

2          Virgin Islands?

3    A.   Yes.

4    Q.   And did Marshal Wirshing express to you

5          any views about -- directly himself any

6          views as to whether you should go to the

7          Virgin Islands?

8    A.   No.

9    Q.   One way or the other he didn't say

10         anything to you?

11   A.   No.

12   Q.   Did Marshal Wirshing have to approve in

13         order for you to go on the detail to the

14         Virgin Islands?

15   A.   By all means, yes.

16   Q.   And so he formally approved of it,

17         correct?

18   A.   Yes.

19   Q.   But did you speak to him personally

20         about it?

21   A.   Again he did not respond even to my

22         request for acting chief time in Puerto

23         Rico.

24   Q.   Now, once you were prepared to be sent

1       time?

2   A.  I think it was either Sandra Lyles or

3       Katherine Mohan.

4   Q.  And what did they say?

5   A.  Katherine Mohan, now that I'm kind of

6       thinking it through, said, well, I have

7       to get back to you and eventually said

8       that --

9   Q.  Did she eventually get back to you?

10  A.  Yes, eventually she did.

11  Q.  And what did she say when she got back

12      to you?

13  A.  She said that, well, that is not

14      correct.  It's not a chief deputy

15      position.  It's an assistant chief

16      deputy position.  And I said, "Well, I'm

17      obviously already an assistant chief.

18      So I don't need to put in for it."  And

19      she said that's right.

20  Q.  Now, did you correspond by e-mail with

21      Miss Mohan about this situation?

22  A.  Sure, yes, yes.  At that point I was

23      trying to get it in writing.

24  Q.  And did Miss Mohan correspond with you?

1    A.   Yes.

2    Q.   I'm going to turn your attention to

3         Complainant's Exhibit 9.  Does

4         Complainant Exhibit 9 reflect the

5         correspondence that you had with Miss

6         Mohan by e-mail regarding the situation

7         and whether the position was a chief or

8         an assistant chief position?

9    A.   It does.

10   Q.   And Miss Mohan then agrees with the

11        assertion that there are now going to be

12        two assistant chiefs in Puerto Rico but

13        no chief?

14   A.   Right, even though there were apparently

15        three.  But I didn't know that.

16   Q.   Is that something you are referring to

17        from Mr. Lazar's opening statement

18        today?

19   A.   Right, yes.

20   Q.   Now, in your experience in Puerto Rico

21        were you aware of a previous time when

22        there was no chief but multiple

23        assistant chiefs?

24   A.   No.

1    Q.  Would that have been a common practice

2        as far as the Marshal Service from your

3        years of experience?

4    A.  No.

5    Q.  So did you find this odd or surprising?

6    A.  Yes, yes.

7    Q.  What else did you think about it?

8    A.  I thought it was a direct intent to

9        fulfill what he had said, that he would

10       "get one of our own".

11   Q.  That he was going to discriminate

12       against you and let you not be the

13       chief?

14   A.  A hundred percent.

15   Q.  Was there anyone else who would have

16       been -- what's the area of consideration

17       for a temporary chief not to exceed one

18       year?  In other words, who is eligible

19       to apply for that position in Puerto

20       Rico?

21   A.  It would be anybody in the District

22       who's a 13 or has been a 13 for a year

23       at the time of appointment, which is

24       kind of an important thing from what Mr.

```
 1          Lazar said.

 2    Q.    And when Mr. Soto held the position he

 3          was a GS-15, correct?

 4    A.    Right.

 5    Q.    And was there anyone else who was

 6          eligible to become the chief at the

 7          GS-15 level other than you?

 8    A.    Nobody in the District, no.

 9    Q.    Was Mr. Soto gone from the District by

10          this point?

11    A.    By this point, yes.

12    Q.    So do you happen to recall when he left?

13    A.    It was the first week of January or the

14          last week of December.

15    Q.    So whoever would be selected for the

16          positions that they were or the position

17          that they were looking for the temporary

18          promotion on would in fact be

19          functioning as Chief in the District or

20          the leading person in the District,

21          correct?

22    A.    Yes.

23    Q.    So would you say that -- turning your

24          attention back to Plaintiff's Exhibit 9
```

1    Q.   Were you in Puerto Rico for several days

2         that week?

3    A.   Yes.

4    Q.   And that turned out to be, it turned out

5         that there was one week in between that

6         week and when you actually reported back

7         permanently to Puerto Rico, correct?

8    A.   Right, yes.

9    Q.   Now, during this week when you spent

10        some time in Puerto Rico and the

11        following week when you were not in

12        Puerto Rico, did you ever develop any

13        information with regard to what your

14        situation would be when you got back to

15        Puerto Rico?

16   A.   Yes.

17   Q.   What information did you develop?

18   A.   I received phone calls from folks over

19        in PR that -- well, specifically Robert

20        Vizcarrondo on March 25th or 24th, the

21        Friday before I reported back telling me

22        that he had had a conversation with

23        Marshal Wirshing.  And that was the

24        conversation where Marshal Wirshing and

1        Juan Donato wanted to get his help to

2        "te joderlo", screw me up, and that he

3        was to give me the worse car that they

4        had, and that I would be doing nothing

5        essentially, watching the cell block.

6    Q.  Did you develop any other information to

7        that effect?

8    A.  Yes.  About the 23rd or 24th I got a

9        call from Javier Jimenez who at that

10       time said something about he had had a

11       conversation with Marshal Wirshing when

12       Marshal Wirshing had said on the 20th

13       that I was -- well, pardon my English,

14       but said, Marshal Wirshing said "that

15       fucker, Orr" is coming back.  And then

16       he also said I know he's suing me.

17                   And then also I had gotten

18       a call from Terry Walter in Des Moines,

19       Iowa that same week.

20   Q.  Who is Terry Walter?

21   A.  Terry Walter was my first chief and my

22       mentor.

23   Q.  Is he also familiar with Marshal

24       Wirshing?

Page 131

1    A.    Exactly right.

2    Q.    Now, did anyone indicate to you before

3          you went back to work that you were

4          going to be reassigned to work in the

5          task force?

6    A.    Yes.

7    Q.    And how did you hear about that?

8    A.    Through, I think, Vizcarrondo.

9    Q.    And then you in fact reported back to

10         work on the 27th; is that correct?

11   A.    Yes.

12   Q.    And when you reported back to work on

13         the 27th, were you in fact reassigned

14         away from the task force?

15   A.    Yes.

16   Q.    And were you given orders in writing?

17   A.    Yes.

18   Q.    And those orders -- are those orders

19         reflected in ROI -- Exhibit 27 of the

20         ROI?  I'm sorry.  Well, let me point

21         your attention to Exhibit 27f.  Well,

22         strike that.  Let me do this a different

23         way.

24                    How about Complainant's

1        Exhibit 21.  I'll ask you if that's the

2        document that you received on March

3        27th?

4    A.   It was.

5    Q.   And this document ordered you to be

6        reassigned, correct?

7    A.   Yes.

8    Q.   To daily movement of prisoners, correct?

9    A.   Correct.

10   Q.   Now, is the daily movement of prisoners

11        did those duties involve your being

12        physically assigned to the headquarters

13        building or the task force building?

14   A.   The headquarters building.

15   Q.   And so you were -- had you ever reported

16        to the headquarters building before

17        during your employment in Puerto Rico?

18   A.   Only for briefings.  And prior when

19        Chief Soto was out of town he would put

20        me in charge for a week when he was on

21        vacation or whatever the case might be.

22   Q.   So the only times you had reported for

23        duty as your work station in the

24        headquarters building had been when you

1   A.   Sure, sure.

2   Q.   So were you surprised that you were

3        being reassigned in this fashion?

4   A.   I was crushed.

5   Q.   Why were you crushed?

6   A.   Because even though I knew it was

7        coming, because Robert had said that on

8        Friday, I was embarrassed and felt kind

9        of powerless and just crushed, stunned I

10       guess.  I just felt I was working for

11       the Department of Justice and I went

12       from the task force where I had some of

13       the finest officers in our country under

14       me and now I'm in charge of prisoner

15       movements and don't even have a desk.

16                   And it wasn't the outward

17       things.  It was that I couldn't, I

18       didn't have any respect, any stature in

19       the eyes of my former subordinates, my

20       associates, my friends and even in

21       myself at that point.

22   Q.   Did you have any sort of physical

23       reaction to this situation when you got

24       to work that day?

```
 1         the task force during the tail end of

 2         your detail in the Virgin Islands?

 3    A.   I did.

 4    Q.   And what did you learn?

 5    A.   Several officers -- my former reports

 6         are the officers that I had served with

 7         and served under me told me about the

 8         meeting that the Marshal and Donato had

 9         had on the 10th of March.

10    Q.   And what was your understanding at the

11         time when you heard about it of what had

12         happened at the meeting?

13    A.   That they had called the meeting, called

14         together the officers that spoke Spanish

15         only.  And I can't recall how they

16         excluded -- well, they had spoken

17         Spanish.  So if the officer can speak

18         Spanish they might understand.

19                   And they had specifically,

20         explicitly, and clearly said that they

21         are going to work around the merit

22         promotion system to make sure that they

23         get a Puerto Rican chief in their

24         district, that they are sick and tired
```

Page 138

1      of continental Americans or people

2      coming in from other districts and

3      filling up their package and then

4      leaving, and that it was clear that it

5      was, to the officers as they related,

6      that it was me they were talking about.

7      It was the ultimate, beside

8      powerlessness -- and like I say I worked

9      for the Department of Justice, and it

10     was the ultimate injustice in my mind.

11  Q.  How many people provided you with

12     information about what had happened at

13     the meeting?

14  A.  Around five or six, I think, at the

15     time.  Well, actually over the course of

16     time I think more but five or six at the

17     time.

18  Q.  Now, when you learned this information

19     about -- when did you learn the

20     information about the meeting?

21  A.  It was shortly after I got back in

22     Puerto Rico.

23  Q.  And so that would have been, perhaps,

24     two weeks after you had made the

1           decision to go back to Puerto Rico and

2           not accept the job in the Virgin

3           Islands; is that correct?

4     A.    Right.

5     Q.    Did you reflect at all on the decision

6           you had made to go back to Puerto Rico

7           at the point when you learned about the

8           meeting and when you were reassigned to

9           the prisoner movement?

10    A.    Yes.

11    Q.    And what reflection did you have?

12    A.    I screwed up.  If I had known that this

13          kind of injustice was going on I

14          wouldn't have come back.  I would have

15          taken the job.  I felt totally abandoned

16          by Headquarters and embarrassed sitting

17          there in charge of essentially nothing

18          and felt belittled.

19    Q.    Now, at the time when you made the

20          decision to come back you did already

21          know that your vacancy application --

22          your promotion application for a

23          permanent job had been canceled under

24          what you thought were suspicious

Page 140

1         circumstances, right?

2    A.   Sure, sure.

3    Q.   But you were still willing to go back to

4         Puerto Rico at that point?

5    A.   Yes, because I had told the powers that

6         be this was going on through the right

7         process, the EEO grievance process and

8         something was going to be done.

9    Q.   So back in Puerto Rico when you first

10        returned for your assignment, did there

11        come a point around that time when you

12        were issued a car to drive?

13   A.   Yes, the first day.

14   Q.   Who issue you the car?

15   A.   Hesitantly and apologetically Robert

16        Vizcarrondo.

17   Q.   Can you describe the car?

18   A.   It was either an '89 or a '91 old Ford

19        either Crown Victoria or LTD and it was

20        dilapidated.  It had balding tires as I

21        remember and bad brakes, and the

22        taillights didn't work, some of the dash

23        things didn't work, and it had a loose

24        steering and it had a hundred and some

```
 1         thousand miles if I remember correctly.

 2         In any case the steering was loose.

 3                         As I remember it, Robert

 4         felt so bad about it that at the end of

 5         that first day he said, no, you take my

 6         government car home.  My wife will pick

 7         me up.

 8    Q.   And did he tell you who was actually

 9         responsible for having you issued that

10         car?

11    A.   Yes.

12    Q.   Who?

13    A.   The Marshal and Donato, Juan Donato.

14    Q.   Did Mr. Vizcarrondo tell you that they

15         had told him to do that directly?

16    A.   Yes.

17    Q.   What did he say had been said between

18         himself and the Marshal and Mr. Donato?

19    A.   He said that they had tried to get him

20         to help them to "te joderlo".  That I

21         was coming back to the District and they

22         wanted to get him to "te joderlo", help

23         screw me up.

24                         And the car was certainly
```

Page 142

```
 1          -- we want you to give him the worst

 2          car.  That was what he related were

 3          their exact words and it certainly

 4          fulfilled that.  I think it was

 5          cashiered out whatever form we did that

 6          in instead of even selling it or

 7          anything.

 8                      So he was doing it at

 9          their direct order.

10    Q.    Did you have occasion to discuss your

11          performance standards with anyone around

12          that time?

13    A.    Yes.

14    Q.    Who did you discuss your performance

15          standards with?

16    A.    It would have been about five days

17          later.  Terry Walter was on the island

18          because the Vieques situation is heating

19          up.  I'm on the National Emergency

20          Response Team as his deputy insular

21          commander.  He apparently asked Herman

22          if -- Marshal Wirshing if I can serve on

23          that.  He said "yes".

24                      So I'm with my mentor, my
```

1          former mentor.  And Juan Donato comes up

2          and has me sign the performance standard

3          review as his subordinate.

4     Q.   Did you sign it?

5     A.   Yes.

6     Q.   And so was it your understanding around

7          this time that he was your supervisor?

8     A.   Clearly, yes.

9     Q.   And that's Mr. Donato?

10    A.   Yes.

11    Q.   Now, around this time did you have any

12         conversation with Marshal Wirshing about

13         your EEO complaint?

14    A.   Yes.

15    Q.   What was that?  Tell me what happened

16         there?

17    A.   At some point he specifically told me

18         that he knew that I had filed an EEO

19         complaint.  I think it actually came up

20         in sequence of Juan Donato ordering me

21         not to contact anybody except EEO and my

22         attorney.  And then I asked him for that

23         in writing and he refused.  And about

24         ten minutes later the Marshal calls me

```
 1        and says that he knows that I had filed

 2        a suit against him and not to contact

 3        the EEO or have any contacts outside the

 4        District other than the EEO and my

 5        lawyer.

 6   Q.   Do you recall what the date was when

 7        Marshal Wirshing told you that he knew

 8        about your EEO complaint?

 9   A.   I think it was like the 13th or the 14th

10        of April or the first or second week of

11        April, if I remember correctly.

12   Q.   I'm going to have you take a look at ROI

13        Exhibit 6, which is your affidavit, page

14        four toward the middle of the page.  I'm

15        going to ask you if the information

16        there --

17                   (Interruption)

18             THE COURT:   Off the record.

19                   (Discussion off the

20        record)

21                   (Back on the record)

22   BY MR. GOLDSMITH:

23   Q.   Turning your attention to ROI Exhibit 6,

24        page 4 toward the middle of the page,
```

1          which is your EEO investigative report

2          affidavit, I'd like you to take a look

3          at what you said there and tell me if it

4          refreshes your recollection as to when

5          Mr. Wirshing told you -- Marshal

6          Wirshing told you that he knew about

7          your EEO complaint?

8    A.   I don't see that right offhand in the

9          exhibit book.

10   Q.   I apologize.  I'm going to show you from

11        here.

12   A.   All right.

13             MR. LAZAR:  I object.  The witness

14        has never testified that he had no

15        recollection of the date. In fact he

16        specifically said the date that he

17        believed was April the 13th, 2000.

18                  So I believe it's improper

19        to try to refresh the witness'

20        recollection with a document when he has

21        not demonstrated that his recollection

22        needs to be.

23             MR. GOLDSMITH:  I believe he's said

24        he wasn't certain as to the date.  So I

1       don't know what the transcript says but

2       that's my reflection.  He said he wasn't

3       certain of the date.

4             MR. LAZAR:  Well --

5             MR. GOLDSMITH:  He did identify a

6       date certain but he said he wasn't

7       certain about that date.  I can ask him

8       are you certain if that was the day and

9       then I can refresh your recollection,

10      which is pretty much what I was doing

11      when we stopped.

12            THE COURT:  We'll go ahead. BY MR.

13      GOLDSMITH:

14  Q.  Are you certain -- you testified before

15      the break as to when you thought that he

16      had told you, Marshal Wirshing had told

17      you he knew about your complaint.  Do

18      you remember that testimony?

19  A.  Yes.

20  Q.  Are you -- were you certain from your

21      own direct recollection here today

22      exactly what that date was?

23  A.  No, certainly not.

24  Q.  Does your affidavit I presented to you

1      refresh your recollection as to when

2      that date was?

3   A.  Yes.

4   Q.  And --

5   A.  Sure.

6   Q.  What was the date when Marshal Wirshing

7      told you he knew about your EEO

8      complaint?

9   A.  The 6th of April.  And I think I

10      testified earlier I though it was the

11      first or second week of April, but the

12      6th of April.

13          MR. LAZAR:  I object.  The record

14      obviously speaks for itself.  But my

15      reading of the affidavit says six,

16      meaning paragraph six on April 2000.

17                  Now, the Judge can draw

18      her own inferences.  But I'd just like

19      to point out that the paragraph seem to

20      have numbers preceding them on separate

21      thoughts if you go through them, one,

22      two, three, four.  And obviously it's

23      not transcribed as neatly as one would

24      like.  But the record has got to speak

1        for itself, because if this witness is

2        saying that it occurred on April 6,

3        because it says 6 on April 2000, then I

4        would object.

5   Q.   And I don't have any problem with.  I

6        see the point you're making.

7                    So I would just ask your

8        original testimony was that you weren't

9        certain as to the exact date but you

10       gave a time frame, correct?

11  A.   Right.

12  Q.   And in light of what Mr. Lazar is saying

13       do you -- is your recollection refreshed

14       that it was April 6th that you were

15       relying on the affidavit primarily to

16       refresh your recollection?

17  A.   Relying on that affidavit.  It was like

18       you said, the first or second week in

19       April as I remember.

20  Q.   I apologize if my reading of that

21       resulted in any confusion.

22                    You testified that you

23       were told by Marshal Wirshing to limit

24       your contacts outside of the District

1       around this time; is that correct?

2    A.  Yes.

3    Q.  That's in April of 2000?

4    A.  Yes.

5    Q.  Do you remember when you were told that?

6    A.  It was during the conversation where he

7        said he knew I had filed a lawsuit and

8        said you will not contact anybody.  You

9        are directed not to contact anybody but

10       EEO, my attorney and Internal Affairs I

11       think too he said.

12   Q.  I'm sorry, did you say that he told you

13       that one of the entities to contact was

14       EEO?

15   A.  Yes.

16   Q.  So was it clear to you that at that time

17       he knew that you had gone to EEO?

18   A.  Sure, yes.

19   Q.  And was it clear to you earlier than

20       that that he knew you had gone to EEO?

21   A.  Well, a hundred percent, yes.

22   Q.  How did you interpret -- how did you --

23       how were you informed that you were only

24       permitted to contact those entities you

1       just listed?

2    A.  Like I said Juan Donato called me to his

3        office and he told me that exact line.

4        Do not have any contact with EEO -- with

5        anybody in the Marshal Service other

6        than EEO, your lawyer or Internal

7        Affairs?

8    Q.  Now, was that an unusual order as far as

9        you were concerned?

10   A.  Yes.

11   Q.  Why was it unusual?

12   A.  Never heard of it before.

13   Q.  Well, you've given some testimony about

14       your mentor in Iowa, Terry Walter.

15       Would you have been forbidden to speak

16       to him under that edict?

17   A.  Sure, yes, and special assignments and

18       Headquarters investigation branch,

19       investigative services division, sure.

20   Q.  What about Human Resources?  Was he

21       telling you you were forbidden to

22       contact Human Resources?

23   A.  Yes.

24   Q.  Did Mr. Donato tell you why you were

Page 151

1          being given this order?

2     A.   No, not at the time.  I had my

3          suspicion.

4     Q.   And what did you feel was the reason?

5     A.   To keep me down, to quell any enthusiasm

6          I had for my troops, for life at that

7          point.

8     Q.   I'm going to turn your attention to ROI

9          Exhibit 4, Attachment IV, which -- Four

10         is not with you?

11    A.   Yes, it is.

12    Q.   I thought it was okay.  It may take you

13         a moment to get to it.  But Attachment

14         IV, which is -- and it's next to the

15         last page of Attachment IV.

16    A.   Yes, yes.

17    Q.   What is the second to the last page of

18         Attachment IV?  Can you describe it so

19         we can make sure everybody get the right

20         document?

21    A.   It's an e-mail from me to Martha

22         Green-McDonald in Headquarters dated

23         4/19 of 2000.

24    Q.   And what was the subject?

1    A.   Continuing pattern.

2    Q.   Did you describe what happened here that

3         you were just testifying about?

4    A.   Yes.

5    Q.   Now, it says here that you were directed

6         by Marshal Wirshing.  What did you mean

7         by that?

8    A.   That he directly ordered me, stood in

9         front of me and ordered me to have no

10        contact without his prior approval with

11        USMSL office outside the District of

12        Puerto Rico.

13   Q.   Was Mr. Donato present there when you

14        were given the order as well?

15   A.   Yes, yes.

16   Q.   So why did you use Wirshing's name

17        instead of Donato's?

18   A.   Well, I went to Donato when he first

19        told me and said you are not to have --

20        he said the exact same thing.  You were

21        not to have contact with anybody except

22        EEO, your lawyer and Internal Affairs.

23        And then I said to him, well, put it in

24        writing because obviously I was being, I

1           felt I was being retaliated against

2           because of my grievance or my EEO

3           filing.

4                          And he said -- he

5           dismissed me.  Two or three minutes

6           later Marshal Wirshing called me.  And I

7           go up and he says the exact same thing.

8    Q.   And so Marshal Wirshing is the Marshal

9           of the District and Juan Donato is not,

10          correct?

11   A.   Right.

12   Q.   So when you wrote this memo up, you

13          chose to emphasize that Marshal Wirshing

14          said it; is that fair to say?

15   A.   Sure, yes, yes.

16   Q.   You said at the end, "Obviously I feel

17          retaliation against me is occurring."

18          Do you see that?

19   A.   Yes.

20   Q.   And you said, "This went to the EEO

21          counselor", correct?

22   A.   Right.

23   Q.   Did anyone from the Marshal Service

24          around April 19th of 2000 ever indicate

Page 154

1          to you that they were doing anything at

2          that time to address the propriety or

3          lack thereof of this order that you

4          couldn't communicate with anyone really

5          other than about your complaints outside

6          the District of Puerto Rico office?

7                MR. LAZAR:  Objection.  You are

8          mischaracterizing the letter.  To

9          communicate with anyone outside the

10         District of Puerto Rico regarding the

11         District of Puerto Rico.  It's not

12         saying communicating with anyone outside

13         the District of Puerto Rico.  With that

14         revision, then I think the question

15         would be proper.

16    Q.   And the document speaks for itself.  So

17         with regard to your communications about

18         the District of Puerto Rico, did anyone

19         from the Marshal Service ever indicate

20         to you that anyone was looking into your

21         claim or trying to do anything about

22         your claim that you were being

23         retaliated against at that time by that

24         edict?

1     the 22nd in my mind but I'm not

2     positive.  I think it was June of that

3     year.

4  Q.  And once you had the interview did you

5     subsequently get a disposition as to

6     whether you were being selected for the

7     job?

8  A.  No, no.

9  Q.  And you testified that you went to the

10    interview you think on June 22nd,

11    correct?

12 A.  Right.

13 Q.  And do you remember when you left the

14    Puerto Rico District of the Marshal

15    Service?

16 A.  It was late January or the first couple

17    days of February of 2001.

18 Q.  So that then would be seven or eight

19    months after the interview, correct?

20 A.  Right, right.

21 Q.  Did you during that time in, during that

22    time frame -- well, the last seven or

23    eight months that you were there, were

24    there any additional events that led you

Page 158

```
 1          to think that you were being retaliated

 2          against and harassed and/or caused you

 3          emotional harm?

 4    A.    Yes.

 5    Q.    What happened during those months?

 6    A.    My subordinates were directly being

 7          threatened.  In Jose Conception's case

 8          he was removed from the task force. And

 9          in Raquel Bermudas' case she didn't get

10          a job that she applied for and probably

11          was the best qualified for.

12    Q.    Why did you find those things to be

13          harmful towards you?

14    A.    Well, when they happened they were

15          directly -- the folks that were involved

16          were directly told that these averse

17          things were happening to them because of

18          their association with me.  And that

19          wasn't even necessarily true that they

20          were associated with me.  In many cases

21          they were good professional people who

22          were doing the right thing and doing

23          their job.  And they were associated

24          with me because I was their supervisor.
```

1    Q.   And you testified about someone named

2         Raquel Bermudas; is that correct?

3    A.   Yes.

4    Q.   What was her position?

5    A.   She was a police officer with the POPR.

6         She was on the task force as a task

7         force agent.  She had applied for a

8         federal job as a detention enforcement

9         officer, which is not initially better

10        pay but eventually better pay and better

11        benefits for her.  She was told that she

12        wasn't going to get that job because she

13        was associated with me.

14   Q.   And she told you that?

15   A.   Yes.

16   Q.   And how did you respond when she told

17        you that?

18   A.   I felt powerless and useless and guilty.

19   Q.   What do you mean guilty?

20   A.   She didn't get the job or the

21        opportunity at the job simply because

22        she was seen as being associated with

23        me. So even though I was doing the right

24        thing in terms of filing the EEO

1    complaint, I felt guilty because her

2    being an upright person cost her a

3    different life, the job that would have

4    been better for her family and for her.

5    And because of that association in the

6    eyes of Donato and Wirshing, she didn't

7    get it.

8  Q.  Had you had any occasion to befriend her

9    at all while you were working together?

10 A.  We had a professional relationship over

11    the course of time.  And then she had --

12    I did attend her daughter's first

13    birthday party with some of the other

14    officers from the task force.

15 Q.  What did you say to Miss Bermudas when

16    she told you what had happened to her

17    job application?

18 A.  I apologized.

19 Q.  What did she say?

20 A.  She forgave me.

21 Q.  You mentioned another individual, Jose

22    Conception?

23 A.  Yes.

24 Q.  What happened to him?

1    A.   He received a call in the middle of the

2         night that basically said you are off

3         the task force from the POPR.  He was a

4         fine, honorable officer and he couldn't

5         get a straight answer.  And it became

6         apparent to him that it was because of

7         his association with me that he had

8         gotten the phone call.

9    Q.   Did he tell you who called him in the

10        middle of the night?

11   A.   It was someone in his police chain of

12        command.

13   Q.   In general what's the process by which

14        someone from the police force would be

15        selected to serve on the task force in

16        order to be removed from the task force?

17   A.   We would get some notice from the police

18        department that, hey, Mr. Conception,

19        for instance, your assignment is up, and

20        we have these three candidates for you

21        to interview for replacement on the task

22        force for another two-year detail.

23   Q.   So it's basically a two-year detail?

24   A.   It was different for different agencies.

```
 1        But I believe for POPR it was.
 2   Q.   And was it usually a time certain in any
 3        event that the person was expected to
 4        serve for?
 5   A.   Again for different agencies it was
 6        different.  But for POPR I think it was
 7        a yearly renewed assignment.
 8   Q.   Did you form an impression as to whether
 9        the call that Mr. Conception got in the
10        middle of the night was outside of that
11        norm of a yearly assignment?
12   A.   By all means, sure.
13   Q.   And he was taken off instantly; is that
14        correct?
15   A.   Yes.
16   Q.   Did you ever develop any information to
17        suggest that there was any other
18        possible reason for Mr. Conception to be
19        taken off the task force?
20   A.   Absolutely.
21   Q.   What was that?
22   A.   Juan Donato said to, I believe Andre
23        Jimenez that your buddy, Conception, is
24        going to be off because he's on the
```

1       wrong team or whatever the words were

2       that Donato used. But he made it clear

3       and unambiguous that he was being

4       removed because he was associated with

5       me, which he and I, I remember we would

6       -- I would go running as a stress relief

7       and he would go running with me and we

8       called it our "abuelo gruppa des

9       corianders"(phon) or in my broken

10      Spanish the grandpa running group.  And

11      that was enough for him to be associated

12      with me.

13                      He didn't even speak

14      English.  It wasn't like there was any

15      -- could be any great association.  He'd

16      learned a little English from me.  I'd

17      learn a little Spanish from him, yet

18      that was enough.

19  Q.  Did you ever hear Mr. Donato making a

20      play on words regarding the running that

21      you did with Mr. Conception?

22  A.  I probably did but I can't recall right

23      at the moment.

24  Q.  Did you have occasion to discuss with

1      Mr. Conception his removal from the task

2      force?

3   A.  Yes.

4   Q.  What happened in that conversation?

5   A.  Again I apologized to him because I knew

6      that his association with me that had

7      cost him to be removed from the task

8      force.  And in Puerto Rico it was a big

9      deal because it was like $6,000.00 --

10              (Telephonic interruption)

11          THE COURT:  Let's go off the

12      record for a second.

13              (Off the record)

14              (Back on the record)

15   BY MR. GOLDSMITH:

16   Q.  You were describing a conversation with

17      Mr. Conception.  I believe you said that

18      you apologized.  And I'm not sure if

19      there was any more you got to after

20      that.  But if you could describe it

21      completely, please?

22   A.  He's a very honorable guy, 18 years

23      homicide detective and he forgave me.

24      He said that, I think, through an

1    suggest that there was any other reason

2    for Mr. Conception being taken off the

3    task force in the middle of the night?

4  A.  No, no.

5  Q.  During the period after you went back,

6    the entire period after you went back

7    from the Virgin Islands detail to the

8    Puerto Rico office, did you have

9    occasion to hear that you were being

10   insulted or that averse things were

11   being said about you behind your back?

12  A.  All the time.

13  Q.  What did you hear?

14  A.  My, and I still refer to them as my

15   troops, my subordinates, the people I

16   served with would hear people like Jose

17   Garcia referred to me as an

18   "Americanista".  And of course the

19   whacko comment that he had about me

20   being crazy because I did as part of my

21   management style, I'd put out daily

22   motivational quotes and tried to fire

23   people up.

24                 And I also heard that

1          needed.  But I had to go through the

2          chain of command.

3     Q.   Did anyone -- did it ever get back to

4          you that you were being referred to as

5          "gringo"?

6     A.   Yes.

7     Q.   Did you hear that just a little or

8          frequently?

9     A.   Frequently.  And I was told many times,

10         again not directly to me -- nobody would

11         be man or woman enough to say it right

12         to me, but it was behind my back and in

13         front of my subordinates.  And it was

14         always, to be honest, I really thought

15         -- it sounds tripe, but I always thought

16         fucking gringo was one word because it

17         was always in that light.  It was not a

18         nice term.  It was not a neutral term.

19         It was a disparaging, charged term by

20         all means.

21    Q.   Who told you you were called "fucking

22         gringo"?

23    A.   I heard it from Chris Barfield that

24         overheard it about me from Donato.

1    Q.   He's a Deputy U.S. Marshal?

2    A.   Right.  He was here in Puerto Rico at

3         the time.

4    Q.   And he gave an affidavit in this case,

5         correct?

6    A.   Yes.  I think Andre Jimenez heard it as

7         well.  And certainly I think they had

8         referred to me as "gringo" in the March

9         10, 2000 meeting as well.

10   Q.   Did you ever observe -- are you familiar

11        with a gentleman named Robert Sanchez?

12   A.   Yes.

13   Q.   Who is he?

14   A.   Bobby is an investigator that worked

15        under me on the task force.

16   Q.   Was there ever an occasion when you were

17        asked to take some kind of adverse

18        employment related action toward Mr.

19        Sanchez?

20   A.   Yes, there was.

21   Q.   Who asked you to take action against Mr.

22        Sanchez?

23   A.   I wasn't asked.  I was directed.

24   Q.   By who?

Page 172

1      AWOL and all that was going on; is that

2      correct?

3  A.  Right.  And when he called I even said

4      let me call Bobby and look into it.

5  Q.  Now, during that time frame did you ever

6      hear Mr. Wirshing or Marshal Wirshing

7      refer to his own status in the District

8      of Puerto Rico?

9  A.  Yes.

10 Q.  What did he say about his status in the

11     District of Puerto Rico?

12 A.  Talking about whether or not he would

13     put in for a promotion in Washington and

14     it was --

15 Q.  Whether Marshal Wirshing would put in

16     for a promotion?

17 A.  Right, right.  He stated why would I do

18     that.  Down here I am God.

19 Q.  Did you take -- were you during this

20     period feeling -- what were you feeling

21     yourself?  How was it going for you

22     working in this environment?

23 A.  Powerless, embarrassed, denuded, left in

24     an unjust situation and abandoned by the

1        Department of Justice.

2    Q.  Did you take any action to try to

3        improve your own state of mental health

4        at that time?

5    A.  Yes, I did.

6    Q.  What did you do?

7    A.  I contacted the employee assistance

8        program to get counseling for the

9        stress.

10   Q.  Was there -- and did you in fact get

11       some counseling for the stress?

12   A.  I did.

13   Q.  You heard -- did you hear Mr. Lazar

14       mention in his opening something about a

15       plate that had said I'm Gringo Number

16       One?

17   A.  I did, yes.

18   Q.  Did you have a plate that said I'm

19       Gringo Number One?

20   A.  I think it said "Gringo One", yes.  It

21       was a vanity plate from the San Patricio

22       Mall, little vendors that make them up.

23       And I tried to do it as, to buck me up,

24       to buck myself up to try to be positive.

1      it's a lie.

2              So I remember it and I

3      remember at the time --

4  Q.  How did you feel when you took it down?

5  A.  Again anything that I tried to assert my

6      rights in any way throughout this whole

7      thing, I was shunned and stunted.  Still

8      to this day the Agency hasn't done

9      anything. We're here in court.

10 Q.  Did you have a subordinate named Andre

11     Jimenez?

12 A.  I did.

13 Q.  Was he a good Deputy United States

14     Marshal?

15 A.  Absolutely.  And I'd even, I'd be proud

16     if he were -- you know, one of my sons

17     grows up to be the kind of guy he is, an

18     honorable guy.

19 Q.  Did he ever indicate to you that Mr.

20     Donato had threatened to remove him from

21     the task force?

22 A.  Yes, several times.

23 Q.  Did you ever hear that anybody else was

24     threatened removal from the task force

1          that you haven't testified about today?

2    A.   Not that I can recall right now

3          directly.  But it was an implicit --

4          well, the deputies and the officers

5          would come up to me and say, look,

6          Chief, if we are seen associating with

7          you -- I remember a fellow by the name

8          of, he was with the Puerto Rico

9          Department of Corrections.  And he told

10         me right out that he didn't want to be

11         associated with me because it's going to

12         get me kicked off the task force, which

13         later after I was out of the District he

14         was removed from the task force.  But I

15         don't know what the reasons surrounding

16         his.

17   Q.   But again when you said he was removed

18         from the task force, was he removed

19         pursuant to the normal procedures for

20         removing individuals from the task force

21         or in an unusual manner such as what you

22         said you thought happened to Mr.

23         Conception?

24              MR. LAZAR:  Objection.  The witness

1      Rico?

2   A.  No, I had not; no.

3   Q.  Now, you testified that you left the

4       Puerto Rico District ultimately with a

5       downgrade; is that correct?

6   A.  Yes, I did.

7   Q.  Why did you do that?

8   A.  I got a call from Joe Trendel, who is

9       the chief up in Milwaukee.  And he asked

10      me at that time how I was doing and I

11      said not so good.  And then he offered

12      me the 13 job up there and he basically

13      gave me counsel that I need to get the

14      heck out of there, meaning get out of

15      Puerto Rico, and I did.

16  Q.  What did you tell him about -- did you

17      tell him why you were doing not so good

18      when you had that conversation?

19  A.  Sure.  I related some of the retaliatory

20      acts and feelings of helplessness and

21      stressed out.  And to be honest, not for

22      the last time either, during that time

23      that Joe and I served together and I

24      worked for him, I broke down and cried

Page 181

```
 1          on the phone.
 2    Q.    He heard you crying.  Was that part of
 3          what prompted him to say you needed to
 4          get out of there?
 5    A.    Yes.
 6              MR. LAZAR:  Objection, speculation.
 7          It calls for --
 8              THE COURT:  Sustain.
 9    Q.    Well, did he tell you you needed to get
10          out of there at a point in conversation
11          after you had begun to cry on the phone?
12    A.    Yes, yes.
13    Q.    And are you a person who normally would
14          have cried frequently?
15    A.    Not before this.
16    Q.    Why does what happened to you in the
17          Puerto Rico District prompt you to cry
18          more than you might have in the past?
19    A.    Well, I think before I got there I truly
20          believed that doing the right thing was
21          the way to get ahead.  And that as corny
22          as it might sound, I really believed in
23          truth, justice in the American way.  And
24          I worked for the Department of Justice
```

1      15's when you were in Wisconsin?

2   A.   No.

3   Q.   You testified that you were told about a

4        meeting at the task force at Miramar on

5        March the 10th of 2000; isn't that

6        correct?

7   A.   Yes.

8   Q.   And you testified that it was your

9        impression that what was said at the

10       meeting was directed towards you; isn't

11       that correct?

12  A.   Yes.

13  Q.   And it was -- and who particularly

14       reported the events of this meeting to

15       you?

16  A.   Robert Vizcarrondo, I believe, mentioned

17       it.  No, now that I think about it, it

18       was Bobby Sanchez, it was Andre Jimenez,

19       it was Chris Barfield that heard about

20       it and said it to me.  Javier Jimenez

21       had heard about it and then several

22       people that are not in this case that

23       wouldn't -- that would tell me about it

24       but say that they didn't want to testify

1      said, "Listen, sir, I don't want to have

2      a confrontation to escalate this.  All I

3      want to know is what happened?  I mean

4      is it something I do?  What has happened

5      between us to make you change your mind

6      because you did definitively tell me I

7      could.  And that is why I took the steps

8      I did in looking for a home and

9      applying."

10             And basically he kept on

11     saying he didn't tell me that.  And then

12     he segued, which I thought was an

13     abrupt, weird segue.  I thought it was

14     abrupt and weird because you have to

15     understand the context of the

16     conversation.  The context was such that

17     we were talking about me, me and my move

18     out of Puerto Rico.  And he segued and

19     started talking about Mick Orr and

20     started cussing him out and basically

21     saying that he had filed a complaint

22     against him.  And of course I told him

23     that has nothing to do with me and I had

24     no prior knowledge about that.

1   Q.   And how did he respond when you said it

2        had nothing to do with me and I had no

3        prior knowledge?

4   A.   Oh, I don't recall exactly how he

5        responded.  All I know he was upset and

6        calling him a fucker and stuff like

7        that.

8   Q.   Do you remember anything else that he

9        called him besides a fucker when he was

10       cussing him out?

11  A.   No, I remember that.  I think he said it

12       a couple of times.

13                    Keep in mind now I was

14       ramped up on my situation. Mick Orr and

15       his situation, whatever he was talking

16       about Orr was almost meaningless to me.

17       What was important to me was my

18       situation.  And I couldn't understand

19       why this segue occurred and why he was

20       talking about Mick Orr.

21  Q.   Did Marshal Wirshing ever answer you

22       when you asked him why he was talking

23       about Mick Orr?

24  A.   I don't recall.

1    said, "Listen, sir, I don't want to have

2    a confrontation to escalate this.  All I

3    want to know is what happened?  I mean

4    is it something I do?  What has happened

5    between us to make you change your mind

6    because you did definitively tell me I

7    could.  And that is why I took the steps

8    I did in looking for a home and

9    applying."

10              And basically he kept on

11    saying he didn't tell me that.  And then

12    he segued, which I thought was an

13    abrupt, weird segue.  I thought it was

14    abrupt and weird because you have to

15    understand the context of the

16    conversation.  The context was such that

17    we were talking about me, me and my move

18    out of Puerto Rico.  And he segued and

19    started talking about Mick Orr and

20    started cussing him out and basically

21    saying that he had filed a complaint

22    against him.  And of course I told him

23    that has nothing to do with me and I had

24    no prior knowledge about that.

1    Q.   And how did he respond when you said it

2         had nothing to do with me and I had no

3         prior knowledge?

4    A.   Oh, I don't recall exactly how he

5         responded.  All I know he was upset and

6         calling him a fucker and stuff like

7         that.

8    Q.   Do you remember anything else that he

9         called him besides a fucker when he was

10        cussing him out?

11   A.   No, I remember that.  I think he said it

12        a couple of times.

13                   Keep in mind now I was

14        ramped up on my situation. Mick Orr and

15        his situation, whatever he was talking

16        about Orr was almost meaningless to me.

17        What was important to me was my

18        situation.  And I couldn't understand

19        why this segue occurred and why he was

20        talking about Mick Orr.

21   Q.   Did Marshal Wirshing ever answer you

22        when you asked him why he was talking

23        about Mick Orr?

24   A.   I don't recall.

1    A.   I think at times he meant it as an

2         endearment and at times he meant it as a

3         negative word.  He used it quite a bit

4         and so did a lot of other people and the

5         same thing with them.  At times I think

6         they meant it as an endearment and other

7         times I think they meant it as a slight.

8    Q.   Did you ever interpret -- I'm sorry, go

9         ahead.

10   A.   But I can tell you that I didn't take it

11        as a term of endearment.

12   Q.   Was it used towards you?

13   A.   Myself, other guys from the mainland.

14   Q.   And did you consider it a racial slur

15        when it was used towards you?

16   A.   Yes.  However, obviously there were

17        different degrees of racial slurs.  But,

18        yes, qualifying it not as severe as some

19        other things.  But I did not, I did not

20        think it was something they should have

21        been saying.  I did not like it.  I got

22        tired of hearing it.

23   Q.   And were you personally called gringo by

24        Mr. Donato?

1   A.  Yes.

2   Q.  Did you ever object --

3   A.  And others, many others too.

4   Q.  I understand.  But the only one you

5       remember specifically was Mr. Donato?

6   A.  Fortunately, yes.

7   Q.  Okay.  And did you ever object to Mr.

8       Donato that you didn't like being called

9       gringo?

10  A.  Yes, I'm pretty sure I did.

11  Q.  Did that stop him calling you gringo?

12  A.  I don't recall.

13  Q.  Do you ever recall any point in time

14      when you were still working in Puerto

15      Rico when Mr. Donato stopped calling you

16      gringo?

17  A.  I don't recall.

18  Q.  Did you hear Mr. Donato make any other

19      remarks that you perceived to be

20      disparaging about continental Americans

21      while you were working in the Puerto

22      Rico District?

23  A.  No, not that I can recall.

24  Q.  Did you ever hear any discussion from

1    Q.   And what do you think about Mr. Donato's

2         truthfulness?

3    A.   I don't think he has any integrity

4         either.

5    Q.   Why not?

6    A.   My impression was that Mr. Donato was

7         out for himself.  It's hard.  I mean we

8         don't have that much time.  I just

9         didn't trust Donato at all.  I'm trying

10        to think of a time where he lied to me.

11        I can't recall one.

12                   All I can tell you is I

13        did not trust him.  And I don't think

14        many others did either.

15   Q.   Do you recall any other times that

16        Marshal Wirshing lied to you other than

17        the one that you recounted earlier?

18   A.   No, I don't recall.

19   Q.   Now, did you ever hear the word

20        "maricon" used in the Puerto Rico

21        office?

22   A.   Yes.

23   Q.   Who did you hear use that word?

24   A.   Well, once Acting Chief Donato said that

```
 1          to me.  He called me a maricon.  And I

 2          made it clear to him that he should not

 3          and he stopped.

 4    Q.    What does maricon mean?

 5    A.    What exactly does it mean, fuck?

 6    Q.    You don't know exactly what it means?

 7    A.    No.  I used to know.

 8    Q.    When you were here?

 9    A.    I've been in Tallahassee for four years.

10          I used to know most of the cuss words

11          when I was here.

12    Q.    Was it clear to you that it was a cuss

13          word?

14    A.    Oh, of course.

15    Q.    And so you took it as an insult to be

16          called a cuss word?

17    A.    Yes, and go further and say I was very

18          angry.  And I confronted him immediately

19          when he called me that and he stopped.

20          He never said it again.

21    Q.    Did you ever hear Mr. Donato or Marshal

22          Wirshing refer to Mick Orr as a maricon?

23    A.    Mick Orr?

24    Q.    Yes.
```

1          IN THE UNITED STATES OF AMERICA

2      EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

3

4

5    EEOC NO. 160-A2-8082X

6    ---------------------------------------

7    MICHAEL ORR,

8                  Complainant,

9

10    vs.

11

12    UNITED STATES MARSHAL SERVICE

13                  Respondent.

14    ---------------------------------------

15

16                  VOLUME II OF III

17

18          WEDNESDAY, August 18, 2004

19            8:45 a.m. to 6:55 p.m.

20

21    BEFORE:  THE HONORABLE ANA GONZALEZ

22    Equal Employment Opportunity Commission

23    525 F.D. Roosevelt Avenue, Suite 1202 San

24    Juan, Puerto Rico 00918

1    Q.   But isn't it the case that he came back

2         and had business to do in Puerto Rico on

3         March 13th?

4    A.   I don't know about that.  I don't recall

5         that.

6    Q.   You don't deny it, though, do you?

7    A.   I don't deny it because I don't recall

8         that.

9    Q.   And you don't deny that on March 13th

10        when you saw Mr. Orr back in Puerto Rico

11        you said to him that the USVI was now

12        "his district", do you?

13   A.   I don't recall and I don't deny that

14        either.

15   Q.   Now, on March 17th, on March 17th

16        Katherine Mohan from HRD -- and you know

17        her, correct?

18   A.   Yes, I know her.

19   Q.   Katherine Mohan called you and asked you

20        specifically to clarify whether your

21        vacancy not to exceed one year was for a

22        chief or for an assistant chief, isn't

23        that true?

24   A.   I don't recall that.

Page 496

1    Q.    You don't deny it either, though, do

2          you?

3    A.    I don't deny it either.  You must ask

4          Mrs. Mohan.

5    Q.    And you don't deny, do you, that HRD

6          then informed you that they were asking

7          you that because Mr. Orr had inquired as

8          to whether it was for a chief or an

9          assistant chief, do you?

10   A.    I don't recall that.

11   Q.    But you don't deny it either, do you?

12   A.    And I don't deny that either.  But I

13         wonder why Personnel would ask me a

14         thing like that since they are the

15         experts.

16   Q.    Now, returning your attention -- I'm

17         sorry. Ultimately you told HRD that you

18         were going to select for an assistant

19         chief in March of 2000 and not a chief;

20         isn't that true?

21   A.    I don't recall that.  But I'm going to

22         select an assistant chief when I have a

23         chief vacancy?

24   Q.    You deny that that's what happened?

1   Q.  Acting assistant chief?

2   A.  Right.

3   Q.  Now, it was right around this same time

4       frame of the second or third week of

5       March in 2000 that you learned that Mr.

6       Orr was definitely returning to the

7       District of Puerto Rico; isn't that

8       true?

9   A.  It was sometime in March but not at the

10      beginning

11      of March.  It was sometime after the

12      middle of March going into the latter

13      part of March.

14  Q.  Well, in fact it was -- in fact you

15      learned about that just before you

16      selected Mr. Donato, the temporary

17      assistant chief, and didn't select a

18      chief; isn't that true?

19  A.  No.

20  Q.  You deny that?

21  A.  I deny that.  I don't recall the exact

22      date.  If I had known that Mr. Orr was

23      coming back to Puerto Rico before

24      I had selected Donato not to exceed one

1       year I would have never done a thing

2       like that.  If I had known that -- I

3       thought that at all times that Mr. Orr

4       had accepted a permanent position in the

5       Virgin Islands.

6   Q.  Well, you also knew that as of March

7       17th of 2000 or March 20th of 2000 that

8       Mr. Orr was filing an EEO complaint

9       against you; isn't that true?

10  A.  No, that is not true.

11  Q.  But when did you learn about that?

12  A.  I don't recall but it was much later.

13  Q.  How much later do you claim it was?

14  A.  I don't recall.

15  Q.  Was it later by a week?

16  A.  Maybe much more later.  I don't recall

17      that.

18  Q.  Is there anything that would refresh

19      your recollection as to when --

20  A.  Yes, if you could give me documents that

21      I sent or something like that in writing

22      and signed by me.

23  Q.  But you don't know what document that

24      would be, do you?

Page 505

1           And I bring to your

2      attention the second paragraph of the or

3      the first paragraph.  It says:

4           The statement of

5      understanding which place me under the

6      U.S. Virgin Islands on October 1st as a

7      result of my having volunteered to help

8      the District of the Virgin Islands.

9           It also says:  Similarly,

10     I have applied for two merit promotion

11     position announcements as the Assistant

12     Chief Deputy in Eastern Michigan.

13  Q.  Sir, I didn't ask you to read the whole

14     e-mail. There is really no need right

15     now.  If your counsel wants you to read

16     the e-mail into the record he'll have

17     you do that.

18           It is the case, isn't it,

19     that on March 20th, 2000 you told Javier

20     Jimenez that Mr. Orr had filed an EEO

21     complaint against you, didn't you?

22  A.  No.

23  Q.  You deny that?

24  A.  I categorically deny that.

1  Q.  You deny ever telling Javier Jimenez

2      that Mr. Orr had filed an EEO compliant

3      against you?

4  A.  I deny that.

5  Q.  You never said anything to Mr. Jimenez

6      to that effect?

7  A.  I never said to that effect.  I have

8      other statements that I would like to

9      address later on pertaining to this.

10 Q.  Well, right now I'm just asking you

11     about Mr. Jimenez.

12 A.  I deny that.

13 Q.  So if Mr. Jimenez were to testify that

14     you did say that Mr. Orr had filed an

15     EEO complaint against you, he would be

16     lying; is that right?

17 A.  Yes.

18 Q.  Now, on March 20, 2000, Mr. Jimenez --

19     you told Mr. Jimenez not only that an

20     EEO complaint had been filed by Mr. Orr

21     against you but you told him -- but you

22     called Mr. Orr a "fucker" to Mr.

23     Jimenez, didn't you?

24 A.  I did not and I deny that.  Those words

Page 507

```
 1        are not in my dictionary.
 2   Q.   So if Mr. Jimenez were to testify that
 3        you called Mr. Orr a "fucker" to him in
 4        a private meeting, he would be lying; is
 5        that correct?
 6   A.   He would be lying and he is lying if he
 7        said such a thing.
 8   Q.   Well, you don't deny that you met with
 9        Javier Jimenez on March 20th, do you?
10   A.   I don't recall the exact date.  If he
11        recalls those dates, then he must have
12        something in writing on that.
13   Q.   Do you recall specifically meeting with
14        Javier Jimenez --
15   A.   Well, I met Javier Jimenez many times
16        because he had family problems.
17   Q.   Mr. Jimenez wanted to transfer out of
18        the District; isn't that the case?
19   A.   Since the beginning when he came here
20        Mr. Jimenez wanted to transfer out of
21        the District because his wife is from --
22        I don't know -- from Poland or somewhere
23        and she could not get use to the weather
24        here and she was tired of living here.
```

1    Q.   Turning your attention to the sixth page

2         of the exhibit, it says here on the

3         sixth page of the exhibit just below the

4         middle of the page in a new paragraph:

5                        In a final close-out

6         discussion with Marshal Wirshing, Mr.

7         Orr was identified as having filed the

8         formal complaint.

9                        The Marshal indicated that

10        even prior to any discussions with me,

11        Mr. Orr had been telling everybody that

12        he had filed issues and that he, the

13        Marshal, had already been provided a

14        copy of the memo that the complainant

15        had sent to Headquarters.

16                       Do you deny that you told

17        the EEO counselor that you knew about

18        the complaint based on Mr. Orr telling

19        everybody --

20   A.   No, I don't deny that.  If they say that

21        I said that, that happened so long ago,

22        I don't deny that.  It says it here.

23        And I hope that they are right.

24   Q.   So do you deny that it's the case that

1    Q.    Well, in fact he did call to inquire --

2    A.    That was his responsibility to do it.

3    Q.    In fact he did call to inquire what was

4          going on in the District.  He just

5          didn't call you; isn't that true?

6    A.    No, he never called me.

7    Q.    Isn't it also the case that you wrote a

8          memo in December or January '99 or 2000

9          stating that you did not want Mr. Orr

10         returning to the --

11   A.    Show that to me.

12   Q.    I will.

13   A.    Oh, yes, show that to me.  It's

14         impossible.

15   Q.    I'm showing you Plaintiff's Exhibit 12

16         from the first set.  I'm sorry, I'm

17         showing you the wrong thing.  I

18         apologize.

19   A.    But it's nice to have this Exhibit 12 to

20         refresh my memory.

21   Q.    I'm sorry, bear with me.  I'm showing

22         you Complainant's Exhibit -- I'm sorry,

23         Agency Exhibit 10.  So you have to go

24         into the next set to find Exhibit 10.

1              That comes first about

2      everything.  That is the primary mission

3      of the Marshal Service, then we do

4      whatever we have to do.

5              And that was only until

6      Mr. Francisco Lopez' time of temporary

7      promotion not to exceed 120 days will

8      expire.  And that was going to happen

9      several days after.  That's the reason

10     why.  That's the only reason why.

11  Q.  You didn't tell Mr. Orr in your memo of

12      March 20th when the reassignment to the

13      different duties was going to come to an

14      end, did you?

15      MR. LAZAR:   Objection.  If counsel

16      is referring to the memo, then the memo

17      speaks for itself.  So I object.

18      THE COURT:   Sustain.

19  Q.   I'm asking you, sir, did you inform Mr.

20      Orr when he -- forget about the memo.

21      When he reported on March 27th of 2000,

22      did you tell him how long he was going

23      to be reassigned for?

24  A.   I don't recall that.

Page 533

1  Q.  Did you talk to Mr. Orr about --

2  A.  I don't recall.

3  Q.  Do you deny that you did not tell Mr.

4      Orr how long he was going to be assigned

5      --

6  A.  I do not deny.  I do not recall.

7  Q.  Sir, there is no record if I can't

8      finish the question and if you don't

9      finish the answer.

10               So do you deny that you

11     did not tell Mr. Orr that, that you did

12     not tell Mr. Orr how long he was going

13     to be reassigned for at the time when

14     you reassigned him?

15 A.  I do not deny that.

16 Q.  Now, when Mr. Orr returned on March 27,

17     2000, Mr. Donato was his supervisor,

18     correct?

19 A.  He was the acting -- he was one of the

20     acting assistant chief or the acting

21     chief there.

22 Q.  So he was Mr. Orr's supervisor, correct?

23 A.  Up until he was removed from the place,

24     yes.

Page 534

1    Q.   And you had Mr. Donato discuss Mr. Orr's

2         performance standards with him, didn't

3         you?

4    A.   I had Mr. Donato discuss his performance

5         standards? Not that I recall.  What I do

6         recall was for some reports

7         that were made by the task force while

8         Mr. Orr was in the District of Puerto

9         Rico that were inaccurate and that he

10        was told to correct them because those

11        reports were sent to the other agencies

12        that had a representative in the task

13        force.

14   Q.   Now, on October 18th of '99, you had a

15        vacancy announcement that was posted for

16        your district for a Chief Deputy U.S.

17        Marshal, correct, a permanent position,

18        correct?

19   A.   Yes.  Well, if that's the case I don't

20        know the specific date but I know it was

21        somewhere in October when it was

22        announced by Headquarters.  I don't do

23        those things.

24   Q.   And that was because Mr. Soto was going

1         to be leaving on January 1st, correct?

2    A.   I guess so.

3    Q.   But there was no vacancy announcement

4         posted during September of 1999,

5         correct?

6    A.   I don't recall.  If it was posted in

7         October, that means that it was not --

8         that in September there cannot be

9         another announcement unless they

10        canceled that and re-announced that.

11   Q.   So you agree with the premise of the

12        question then, right, that there wasn't

13        one in September, correct?

14   A.   That there was what?

15   Q.   There was no vacancy announcement for

16        the permanent chief in September?

17   A.   Not that I recall.

18   Q.   And October 18th was after Mr. Orr had

19        gone to the Virgin Islands, correct?

20   A.   Well, he was supposed to report there on

21        October the 1st.

22   Q.   And as far as you know he did, right?

23   A.   As far as I know, yes.

24   Q.   And in your estimation I believe you

Page 536

```
1        testified a few minutes ago that it

2        takes many months to get a new chief on

3        board by going through the whole

4        personnel system, including the

5        interview, the Career Board and all

6        that; isn't that true?

7    A.  Yes.

8    Q.  But you waited until after Mr. Orr was

9        gone on the detail to have the vacancy

10       posted in October, right?

11   A.  That's a question that you must ask HRD

12       why they announced that position in

13       October.

14   Q.  Well, they announced the position after

15       you gave them a request to have the

16       position filled, right?

17   A.  But you have to look at my request.

18   Q.  But you did make the request, right?

19   A.  I don't recall that.  But if they made

20       it upon my request, then I did.  But if

21       I don't recall, I don't recall.

22                  When they advertise the

23       position it's up to them.  Sometimes the

24       District request positions to be
```

Page 537

1    advertised and they don't do that right

2    away.  They do that --

3  Q.  You don't claim that HRD waited until 18

4    days after you requested to have the

5    position filled to post the vacancy

6    announcement, do you?

7  A.  That's a matter of HRD to respond.

8  Q.  But you don't claim that you know that

9    happened, do you?

10  A.  No.

11  Q.  Now, you never contacted Mr. Orr while

12    he was in the Virgin Islands to inform

13    him that the permanent chief's position

14    was coming open, correct?

15  A.  No, not that I recall.

16  Q.  And you didn't want him to have that

17    permanent position, right?

18  A.  What?

19  Q.  You didn't want him to have the

20    permanent chief's position, GS-15,

21    correct?

22  A.  No, that is not correct.

23  Q.  That's not correct?

24  A.  No.

1    Q.   And after that you had Mr. Orr's travel

2         and interview both canceled in February

3         of 2000, correct?

4    A.   No, no, no, no, that is not the case.

5    Q.   Well --

6    A.   The documents were sent to the District

7         of the Virgin Islands, that I do recall,

8         because the announcement to travel, if I

9         do recall, was addressed to the District

10        of the Virgin Islands where he was on a

11        TDY assignment where they should cover

12        all those expenses.  And that before,

13        prior to that they must be approved by

14        the Office of the Deputy Director in

15        accordance to the statement of

16        understanding.

17   Q.   So you claim that you had no role to

18        play in Mr. Orr's travel being canceled,

19        correct?

20   A.   I have none.  As far as the only thing

21        that I have the role is to advise Mr.

22        Garcia that the funding for those travel

23        must be provided by the district to

24        where he was assigned and approved by

Page 552

1       he be promoted at that time, correct?

2   A.  That is correct.

3   Q.  And you claim that you don't know why he

4       wasn't promoted, correct?

5   A.  That is correct.

6   Q.  It's true, isn't it, that the vacancy

7       announcement for the position 99-078 was

8       canceled in February 2000, isn't it?

9   A.  I know it was canceled.  The exact date

10      I don't know.  I don't recall.

11  Q.  And you say that the cancellation of the

12      vacancy announcement didn't have

13      anything to do with Mr. Orr having gone

14      to the Virgin Islands, correct?

15  A.  That is correct.

16  Q.  And you say that you don't know the

17      reason for the cancellation, correct?

18  A.  The reason for the cancellation in

19      accordance to what, if I recall, there

20      were only two applicants or

21      something like that.  But I don't really

22      recall that.  And that those

23      recommendations are done by HRD and not

24      by me.

Page 553

1   Q.   And in fact it's too long ago for you to

2        really recall exactly what the reason

3        was, correct?

4   A.   That is correct.

5   Q.   Now, you say that you don't remember

6        anyone ever telling you why it was

7        canceled, correct?

8   A.   I said that that would be the case after

9        we have discussed that later on that

10       only two applicants had applied for that

11       position and based upon the

12       recommendation made by HRD that we

13       should have a broader amount of

14       applicants to apply for it.

15   Q.   When I took your deposition back in

16       2002, page 69,

17       I asked you, question, on line 17:

18             Did anyone ever tell you

19       why the announcement was canceled?

20             And you answered:  I do

21       not recall about that.

22             And then I asked you:  Is

23       there anything that would refresh your

24       recollection as to why the announcement

Page 554

1       was canceled?

2                    And you said:  I think you

3       should ask HRD because I do not recall.

4   A.  That's basically what I responded to.

5   Q.  Now, you also say you don't recall whose

6       decision it was to cancel the

7       announcement, correct?

8   A.  I think that you should ask the Office

9       of the Director, the Office of HRD.

10  Q.  And that's because you don't have any

11      idea whose decision it was, right?

12  A.  We don't have the power to do that.

13  Q.  And you don't even have any information,

14      right?

15  A.  Well, I know that the position was

16      canceled.

17  Q.  But you don't know who made the

18      decision, right?

19  A.  (Witness indicating.)

20  Q.  Can you answer yes or no?

21  A.  No.

22  Q.  Now, you say that you guess that HRD

23      would have been involved in that, right?

24  A.  Would, must be involved in that.

Page 555

1    Q.   But you say that you were not involved

2         in the decision to cancel the

3         announcement, correct?

4    A.   Well, to the best of my recollection we

5         could have discussed something and based

6         upon the recommendation I gave mine.

7         But that happened so long ago.

8    Q.   Page 67 I asked you at your deposition:

9                   All right.  Did there come

10        a time when the vacancy announcement for

11        the GS-15 position was canceled?

12                  You answered:  "I think

13        so."

14                  And then I asked you:  Did

15        you have any involvement in the decision

16        to cancel it?

17                  And you said:  I don't

18        think so.  I don't recall that.

19                  And I asked you:  Who did

20        have involvement in the decision to

21        cancel it?

22                  And you said:  That you

23        must discuss the matter with HRD.

24                  Do you remember those

Page 556

1      questions and answers?

2   A.   Yes.

3   Q.   But you also won't deny that you might

4        have participated in the cancellation,

5        correct?

6   A.   In the cancellation?

7   Q.   Or the vacancy announcement.

8   A.   Only to questions that they made to me.

9        That's the only thing that we can do.

10  Q.   So you might have participated in the

11       cancellation of the vacancy announcement

12       after all, correct?

13  A.   I could but I don't recall that.  That's

14       very rarely done.

15  Q.   And you don't actually recall whether

16       there was an issue as to whether or not

17       there were enough candidates for that

18       position, correct?

19  A.   I don't really recall.  That happened so

20       long ago.

21  Q.   And it could have been you who thought

22       that there weren't enough candidates but

23       it also could have been someone else,

24       correct?

Page 557

1    A.    It could be.

2    Q.    If it was you who thought there weren't

3          enough candidates, you don't know why

4          you thought that, correct?

5    A.    I don't know why.

6    Q.    And there is nothing that could refresh

7          your recollection as to whether you

8          actually did or did not participate in

9          the vacancy announcement being canceled,

10         correct?

11   A.    Nope.

12   Q.    In fact you claim that you are not sure

13         if HRD might have canceled the vacancy

14         announcement for 99-078 without your

15         knowledge, right?

16              MR. LAZAR:   Objection to the form

17         of the question "claim" vague.

18   Q.    Well, you say that you are not sure if

19         HRD might have canceled it without your

20         knowledge, right?

21   A.    That's a question that I cannot really

22         answer because I don't know what

23         decisions they make there and based on

24         what.   I know that most of the time that

Page 558

```
 1        they -- when they select something they

 2        send that for -- I'll say for

 3        professional reasons they send that to

 4        the District.  But most of the time when

 5        selections are made, although we might

 6        recommend some selection, most of the

 7        time they are or almost all the time

 8        they ones selected are the ones on the

 9        top of the list.

10   Q.   But I'm not asking you about

11        recommendations now. I'm just asking you

12        about your knowledge of the process?

13   A.   I don't recall that.

14   Q.   You don't recall whether or not HRD

15        might have canceled it without your even

16        knowing about it, right?

17   A.   I don't recall.  That happened so long

18        ago.

19   Q.   You don't even remember if anyone ever

20        told you why the announcement was

21        canceled, right?

22   A.   No, I don't recall that.

23   Q.   And there is nothing that could refresh

24        your recollection as to why the
```

```
1       And Mr. Orr knows very well how that

2       process works because he has

3       participated in them.

4                    How they come to that?

5       There is a process that says the amount

6       that are on the scores that they give.

7       One is the examination, the other one is

8       whatever the things are.  The packet

9       awards the education, something like

10      that.  But we don't get involved in

11      those things.  And Headquarters sends

12      that to us.

13   Q. Isn't it a fact, Marshal Wirshing, that

14      on a competitive GS-15 job vacancy the

15      decision has to get to the Career Board

16      at some point; isn't that true?

17   A. It's not only to the GS-15's, it's to

18      GS-12's, 13's and 14's.

19   Q. As to the GS-15 it has to get to the

20      Career Board

21      at some point, right?

22   A. Oh, yes.

23   Q. And in order for it to get to the Career

24      Board there has to first be an
```

Page 567

1          interview, correct?

2    A.   Yes.

3    Q.   And therefore if one doesn't have an

4          interview one can't be selected for a

5          competitive GS-15, correct?

6    A.   That is correct.  I think so.

7    Q.   So Mr. Orr -- and in fact when the

8          Career Board considers the application

9          one of the things they consider is an

10         interview, correct?

11   A.   They should.

12   Q.   So if Mr. Orr wasn't interviewed, he

13         couldn't be considered by the Career

14         Board, correct?

15   A.   That is correct.

16   Q.   So it can't be the case that Mr. Orr

17         wasn't promoted to GS-15 at that time

18         because he didn't get the highest score,

19         can it?

20   A.   Well, if he was not called to interview

21         he cannot be promoted.

22   Q.   Right.  But it wouldn't have anything to

23         do with whether he had scored more from

24         HRD before the time of the interview?

Page 570

1    Q.   You claim you have no idea as to whether

2         or not Michael Orr applied under that

3         Vacancy Announcement 00-029, correct?

4    A.   I have no idea.

5    Q.   And you claim that you don't recall

6         whether you sought cancellation of that

7         announcement, right?

8    A.   I have no idea.

9    Q.   And if Katherine Mohan were to testify

10        that you did seek cancellation of

11        vacancy announcement 00-0029, would you

12        agree with such an assertion?

13   A.   I would agree with that because she's

14        the one that handles everything.  So she

15        will refresh my memory.  But those

16        things, she handle those things.  There

17        are many important matters that the

18        District has to deal with on a daily

19        basis that have specific dates and time

20        of things like that.

21   Q.   Well, in fact the cancellation of

22        Vacancy Announcement 00-029 occurred two

23        weeks after Mr. Orr accepted a downgrade

24        assignment out of Puerto Rico in, he

Page 572

```
 1        that we can promote our own people, do

 2        you?

 3             MR. LAZAR:  Objection, vague and no

 4        time frame.  Any time, any meeting?

 5   Q.   Do you recall a meeting on March 10th at

 6        the task force, March 10th of 2000?

 7   A.   As I said before, you have asked me that

 8        question and I don't recall.  We had

 9        many meetings in the task force.

10                      And I don't know how we

11        can bypass the Career Board.  I don't

12        know.  I've been here nineteen some

13        years and I don't know how you can

14        bypass a Career Board.  I don't know

15        how.

16   Q.   Do you recall ever being in a meeting

17        where Juan Donato said -- I'm sorry, you

18        don't deny that you were on one occasion

19        in a meeting where you heard Juan Donato

20        say something to the effect of what

21        we're trying to do is get around the

22        merit promotion system so that we can

23        promote our own people?

24   A.   I don't recall that.  But I don't know
```

1      how can we get -- bypass the merit

2      promotion.  There is no way.  That is

3      illegal.

4   Q.  But you don't deny being in the meeting

5      and hearing him say that, correct?

6   A.  I don't recall him saying those things.

7   Q.  And you also don't deny having been

8      there and having heard it, correct?

9   A.  Yes, I don't deny that.  But I don't

10      recall that.

11  Q.  You also don't deny that in that same

12      meeting you said something in reference

13      to what Mr. Donato had said that

14      I just referred you to, to the effect of

15      what, he, Mr. Donato was trying to say

16      is we are tired of gringos coming in

17      here and getting promoted and leaving

18      with their inflated egos, right?

19  A.  First of all, let me clarify one thing.

20      The word "gringo" is not a derogatory

21      word.  Secondly, that word is

22      not in my dictionary.  Third, during the

23      basketball game in the Olympics the word

24      "gringo" was used by continental U.S.

Page 574

1      or citizens through national television

2      several times, okay.

3  Q.  So you don't deny making the statement,

4      right?

5  A.  No, no, no.  Wait, wait.  I don't use

6      the word "gringo".  I don't address

7      gringo.  That is not a diminishing word.

8      That is not in my dictionary.  I do

9      respect people for what they stand and

10     for what they represent.  I don't like

11     to humiliate people.

12 Q.  And except on that occasion you don't

13     deny having made the statement I

14     referred you to, correct?

15         MR. LAZAR:    Objection.  That's

16     asked and answered.

17 Q.  No, it's not answered.  My question is

18     do you deny making the statement in

19     reference to the earlier comment of Mr.

20     Donato in a task force meeting on March

21     10th, 1999 of what he's trying to say is

22     we're tried of gringos coming in here

23     and getting promoted and leaving with

24     their inflated egos?

1   A.   I don't recall saying that.

2   Q.   And you don't deny it either, do you?

3   A.   No, I don't recall or deny that.  I

4        don't recall that.

5   Q.   And you don't deny it, right?

6   A.   No.

7   Q.   No, you don't deny it.

8              You also don't deny that

9        you may have said that it would be

10       preferable to have someone from Puerto

11       Rico be the chief rather than someone

12       who's not from Puerto Rico, correct?

13  A.   I deny that.

14  Q.   Page 115, Counsel.  In your deposition I

15       asked you, sir --

16            MR. LAZAR:  What line?

17  Q.   Line 22.

18             Have you ever had any

19       conversations with anyone about whether

20       or not it would be preferable to have

21       someone from Puerto Rico as chief?

22             And you answer:  "I do not

23       recall doing that."

24             And I asked you:  "Do you

1        deny having done it?"

2                    And you said:  "Same

3        answer as the previous one."

4                    Now, you say that you

5        don't recall the March 10th meeting that

6        you convened at the task force, correct?

7    A.  That's correct.

8    Q.  But you also don't deny that there might

9        have been such a meeting, correct?

10   A.  That is correct.

11   Q.  Now, you don't deny that you told a

12       Deputy United States Marshal about Mr.

13       Orr's EEO complaint, do you?

14   A.  That I told?  Which Deputy United States

15       Marshal?

16   Q.  You don't deny that you told a Deputy

17       United States Marshal about the EEO

18       complaint before?

19   A.  The deputy?

20   Q.  A deputy.

21   A.  A deputy.  I don't recall that.

22   Q.  You don't deny it either, right?

23   A.  Why should I?

24   Q.  So you don't?

Page 582

1   though if there were some allegations

2   that must have been from Donato, how can

3   I discuss the matter with the same

4   person to whom the allegations are being

5   made for?  That's illogical.

6   Q.  Now, you don't deny saying that you

7   would "joderlo" or screw up Mick Orr, do

8   you?

9   A.  What?

10  Q.  You don't deny that, do you?

11  A.  I deny that.

12  Q.  Now, I took your deposition back in

13  2002.  On page 151, line 16 I asked you:

14  "Did you say that you were going

15  to joderlo or screw up Mick Orr?"

16              And you answered:  "I

17  don't recall that."

18              And then I asked you:  "Do

19  you deny having said that?"

20              And you said:  "I don't

21  recall that."

22              Now, you don't deny that

23  you've heard Juan Donato use the term

24  "maricon" in the office, correct?

Page 590

1       changed because I learned things later

2       on.

3   Q.  Well, all right, as of --

4   A.  I'm sorry, not Andre Jimenez.  It's

5       Javier Jimenez.

6   Q.  Okay.  Andre Jimenez is truthful,

7       correct?

8   A.  Please, please, please forgive me for

9       that mistake.

10  Q.  No problem.  Andre Jimenez you remember

11      him as well, correct?

12  A.  Oh, yes.

13  Q.  A different person, correct?

14  A.  He's a nice person to the best of my

15      knowledge.

16  Q.  Right.  And he and Javier Jimenez are

17      two completely different people?

18  A.  Two completely different persons.

19  Q.  And Andre Jimenez you know to be

20      truthful, correct?

21  A.  To the best of my knowledge, yes.  At

22      least he hasn't lied to me.

23  Q.  And you don't know of any lies by Jose

24      Conception either, do you?

Page 595

1  A.  Well, he was and I think that he's

2      still.

3  Q.  But he was at one time you know that,

4      correct?

5  A.  Oh, yes, assigned to the task force.

6  Q.  And he was assigned to the task force

7      for a time under Mr. Orr's supervision,

8      correct?

9  A.  He was one of Mr. Orr's personal

10     friends.

11 Q.  And Mr. Conception was later fired from

12     the task force, correct?

13 A.  He was requested to leave the task

14     force.

15 Q.  He was asked to leave the task force

16     through a phone call that came to him in

17     the middle of the night, right?

18 A.  I don't know about that.

19 Q.  You don't deny it, do you?

20 A.  In the middle of the night?

21 Q.  You don't deny it, do you?

22 A.  But I don't know about that.

23 Q.  So you don't deny it?

24 A.  Well, I don't know about that.  In the

1  Q.  Okay.  Is it different in the fact that

2      it appears that your signature has a big

3      "X" over it and your name stamp has

4      lines through it; is that correct?

5  A.  That is correct.

6  Q.  Is it also different in that there is

7      some handwriting in the middle of the

8      form which appears to say travel order

9      canceled?

10  A.  Travel order canceled, no funds

11      available, and then my initials and the

12      date I signed it.

13  Q.  So does that indicate your writing, that

14      you wrote that?

15  A.  Yes, sir.

16  Q.  Why did you write that?

17  A.  If I don't recall wrong, Mick was

18      detailed to the Virgin Islands for 180

19      days I think it was.  And as you see the

20      travel schedule it says from St. Thomas,

21      U.S. Virgin Islands to New Orleans.  And

22      I did sign it in the beginning when I

23      just got it, you know.  When I took it

24      to make the arrangements for the travel

1    and everything, I was informed by the

2    Marshal that all travel and everything

3    has to be performed from the Virgin

4    Islands, any travel related to Mick Orr.

5                    So I called Hortensia and

6    let her know.  And then I told her I was

7    going to fax her a copy of the order

8    already signed by me but for her to have

9    it as a reference to make her order down

10   there.

11   Q.  And who is -- I'm sorry, go ahead.

12   A.  That's as far as I recall.

13   Q.  And who is Hortensia?

14   A.  Oh, I'm sorry.  Hortensia LaBorde is the

15       AO, my counterpart, my peer in the

16       Virgin Islands in St. Thomas.

17   Q.  So your testimony you had a conversation

18       with Marshal Wirshing?

19   A.  Yes, sir.  If I don't recall wrong, I

20       informed him that I was going to send

21       these copies to Mick Orr for his travel

22       to New Orleans.

23                    Why are you signing those

24       copies?  I said because he sent it to

Page 732

```
 1        me.  He said he has to do everything

 2        through Headquarters -- through the

 3        Virgin Islands through Headquarters.

 4   Q.   So at some point did you fax this

 5        document back to Miss LaBorde?

 6   A.   Yes, I did.  Here's my, the fax sheet

 7        that was sent to her actually.  Actually

 8        it's to Hortensia and to Mick,

 9        both of them.  It says Hortensia, Mick

10        or both.

11   Q.   Now, just so the record is clear, could

12        you just identify where in the record

13        you are referring to?  I mean what's

14        this document?

15   A.   It's number two first page.

16   Q.   Okay, thank you.  Now, after you faxed

17        this document to Hortensia and Mick Orr,

18        did you get any type of response from

19        either one or both?

20   A.   I don't remember if I talked to Mick Orr

21        or to Hortensia.  I actually don't

22        remember which one of them I talked to.

23        But I did talk to one of them actually,

24        telling them.
```

Page 734

1           the word "maricon" in the office?

2    A.    Well, needless to say that's a lingo

3           that we Puerto Ricans use a lot here in

4           Puerto Rico and essentially when we

5           address one another when men are by

6           themselves, not in front of ladies.  But

7           normally we call each other, hey -- can

8           I repeat the word here?  Hey, maricon.

9    Q.    Now, have you ever heard Juan Donato use

10          that word, "maricon"?

11   A.    Yes.

12   Q.    Have you ever heard Mick Orr use the

13          word "maricon"?

14   A.    Well, Mick Orr, no, I don't remember him

15          saying it.

16   Q.    How about Marshal Wirshing?  Have you

17          ever heard Marshal Wirshing use the

18          word, "maricon"?

19   A.    No, no.  I'm clearly to say that Marshal

20          Wirshing, even though he's about my same

21          age, he's very proper in his talking.

22          He doesn't make any cuss words.  And he

23          don't even like people to be called by

24          nicknames.

Page 735

1    Q.   How about the word "gringo".  Have you

2         used that word, "gringo" in the office?

3    A.   Oh, I use it continuously and not in the

4         derogatory meaning of it as some places

5         on the mainland.  Here in Puerto Rico we

6         identify -- and I'm pretty sure Mick

7         knows that -- any English speaking

8         person that comes to the island, it

9         doesn't matter where they come from, we

10        call them gringos.  And sometimes they

11        are addressed, hey, gringo, come here.

12   Q.   And that's what you interpret the word

13        to mean?

14   A.   Yes.

15   Q.   And have you ever heard Juan Donato use

16        the word "gringo"?

17   A.   Yes.

18   Q.   How about Marshal Wirshing.  Have you

19        ever heard Marshal Wirshing use the word

20        "gringo"?

21   A.   I have heard him say it on specific

22        conversations between some of us.  But I

23        have never -- I do not dare to

24        say -- actually I do not dare to say

Page 736

1          that I actually heard him, for example,

2          talking to Mick or talking to another

3          continental saying, gringo, come here.

4          No, not in that way.

5     Q.   Now, have you ever heard Mick Orr use

6          the word "gringo"?

7     A.   Well, he was Gringo Number One in my

8          office actually.

9     Q.   How do you know that?

10    A.   He used to say it.  And he had a sign

11         like a car tag -- that's you how say it,

12         a license tag that says Gringo Number

13         One, right?  I'm sorry.  I don't know if

14         I should ask you that.

15    Q.   Now, you've actually seen this car tag

16         that he had in his office that said

17         Gringo Number One?

18    A.   Yes.

19    Q.   Do you remember where it was in the

20         office?

21    A.   I think it was either by the entrance or

22         on one of side walls.  I just cannot

23         recall.  It's so many years now.

24         I don't recall exactly where it was at.

Page 737

1   Q.   Do you recall how long it was up there

2        in the office?

3   A.   No, because I went to the task force

4        maybe two or three times a week, not

5        everyday.  No, I don't recall.

6   Q.   But you specifically recall seeing it?

7   A.   Oh, yes, I do.

8            MR. LAZAR:  I have nothing further.

9

10                  CROSS EXAMINATION

11

12       BY MR. GOLDSMITH:

13   Q.  You never heard any explanation for the

14       statement Gringo Number One, correct?

15   A.  An explanation as such, no.

16   Q.  You never asked for any explanation of

17       it either, correct?

18   A.  No.

19   Q.  It's true, isn't it, that Marshal

20       Wirshing called Mr. Orr "whacko" to you,

21       correct?

22   A.  No.  I think that was me who said that,

23       not Mr. Wirshing.

24   Q.  Well, Mr. Wirshing --

```
 1    A.   In a conversation I had of something we
 2         were saying and we were talking, and if
 3         I don't recall wrong, I said, "Mick is
 4         kind of whacko.  He's always sending us
 5         e-mails, things like that every
 6         morning."  And I understand he did it
 7         for the best purpose of the office but,
 8         you know, that was shocking to us in a
 9         sense.
10    Q.   I'm sorry, you're saying that you said,
11         I'm sorry, you're saying that you said
12         that Mick was whacko in a conversation
13         with the Marshal?
14    A.   I think that it was me who said that,
15         yes.
16    Q.   Do you recall that I took your
17         deposition a couple of years ago here in
18         San Juan?
19    A.   Yes.
20    Q.   And page 41, Counsel?
21              MR. LAZAR:  What line?
22    Q.   Line 20.  And at that time I asked you:
23                   Question:  Has the Marshal
24         every indicated to you that he had any
```

1      Donato referring to any of the employees

2      of the Marshal Service who were not from

3      the Island of Puerto Rico as fucking

4      gringos?

5  A.  Yes, I did.  Juan Donato, yes.

6  Q.  Did you hear that on one occasion or

7      multiple occasions?

8  A.  Multiple occasions.

9  Q.  Did you ever hear Mr. Donato use the

10     phrase "gringo maricon"?

11  A.  Yes, I did.

12  Q.  Did you hear him address other

13     individuals that way?

14  A.  Yes, I have.

15  Q.  Did you hear that on one occasion or on

16     multiple occasions?

17  A.  Multiple occasions.

18  Q.  Were you ever addressed in that way?

19  A.  Not to my recollection, no, I don't

20     think I was.

21  Q.  But you personally observed other people

22     being addressed that way?

23  A.  Yes, I have.

24  Q.  Now, when you hear Mr. Donato address

1    about his addressing them with the

2    phrase "gringo"?

3         THE WITNESS:  I believe -- I'm

4    sorry.  If I could just apologize to the

5    Court for bringing the baby.

6         THE COURT:  It's fine.  I have

7    three kids.  Don't worry.

8         THE WITNESS:  Okay, thank you.  I

9    just wanted to apologize.

10         THE COURT:  All right.

11         THE WITNESS:  Yes, with Christopher

12    Barfield I believe one time or a couple

13    of times Christopher Barfield told Chief

14    Donato at the time that he wasn't happy

15    with him being called that or being

16    referred to in that manner.

17    BY MR. GOLDSMITH:

18    Q.  And how did Chief Donato reply to that?

19    A.  Not favorably.  It was -- I think again

20    this was so long ago.  I gave a

21    deposition way back when and, hopefully,

22    that would be in there.

23              But it was something to

24    the matter like if you don't like it,

Page 756

```
 1        you can freaking leave or something to

 2        that effect.  It's pretty much like I

 3        don't really care if you like it or not.

 4    Q.  And this is something you observed

 5        personally, right?

 6    A.  Yes.

 7    Q.  You didn't hear Mr. Donato apologize

 8        when Mr. Barfield was offended, did you?

 9    A.  No, never.

10    Q.  Are you familiar with Jose Conception?

11    A.  Yes, I am.

12    Q.  How did you come to know Mr. Conception?

13    A.  He was my partner on the task force.

14    Q.  So he also was working under Mr. Orr's

15        authority?

16    A.  Yes, he was.

17    Q.  Was me a member of thet Marshal Service,

18        an employee of the Marshall Service?

19    A.  No, he's a member of the Puerto Rico

20        Police Department.  He was a homicide

21        detective before coming to our task

22        force.

23    Q.  And did you get to know Mr. Conception

24        fairly well over time?
```

1    A.   Yes, I did.  Actually I ended up renting

2         a room from him and we became friends.

3    Q.   And did you ever -- do you know whether

4         Mr. Conception ever spent any

5         non-working time with Mr. Orr?

6    A.   They would jog after work.  Detective

7         Conception runs.  He likes to jog.  And

8         I don't know if he still does, but I

9         know back then Michael Orr did also.  So

10        after work sometimes they would jog.

11   Q.   Did you ever come to learn whether Mr.

12        Donato had ever seen Mr. Orr and Mr.

13        Conception jogging together?

14   A.   Yes.  This is something that Jose

15        Conception told

16        me was that Donato had approached him

17        about it.

18   Q.   And what did he tell you had occurred

19        when Donato approached him?

20   A.   That he told him --

21             MR. LAZAR:  Objection, hearsay.

22             THE COURT:  I'm going to allow it.

23             THE WITNESS:  We lived in the same

24        house and sometimes after work we would

Page 758

```
 1        talk.  And he told me, hey, Donato
 2        approached me today about running with
 3        Michael Orr.
 4        BY MR. GOLDSMITH:
 5   Q.   What did he tell you Donato had said?
 6   A.   That he shouldn't do it.  That it looked
 7        bad.
 8   Q.   Did you ever tell Mick Orr that
 9        Conception had told you that?
10   A.   I don't recall.  I don't know if I did.
11   Q.   Is it possible that you did?
12   A.   I may have.
13   Q.   Now, when you were living by Mr.
14        Conception, I guess the same building as
15        Mr. Conception, correct?
16   A.   It's a house.  In Puerto Rico they have
17        houses where they have one house on top
18        of the other.  It's all one house but
19        it's pretty much broken into two
20        separate houses. And I rented the bottom
21        portion of the house and he lived above
22        me.
23   Q.   Did you ever learn that Mr. Conception
24        had lost his position on the Fugitive
```

1      Task Force?

2   A.  Yes, I did.

3   Q.  And how did you learn that he had lost

4       his

5       position?

6   A.  He was my partner.  We worked together

7       and again also we lived in the same

8       residence.

9   Q.  Did you come to learn why he lost his

10      position?

11  A.  Yes.  Well, I can say yes or no.  It was

12      nothing official.  So I can't say he was

13      ever given a letter saying other than he

14      was removed.

15  Q.  What did Mr. Conception tell you about

16      what he knew about why he was removed?

17  A.  It was because of his relationship with

18      Michael Orr.

19  Q.  And how did he know that?

20  A.  Because of the numerous, according to

21      him, the numerous threats that he had

22      been receiving from Donato.  And that

23      Donato had one time approached him -- I

24      was present at one of these -- asking

Page 760

1        him if he was a neatherd insecto.

2    Q.   What does that mean?

3    A.   Kind of a street slang.  And here in

4         Puerto Rico you have prison gangs and

5         you have neatherd, which are supposed to

6         be like a brotherhood that never -- how

7         would you say -- rat on each other.  And

8         then you have the insectos, which are

9         the ones who are put into protection

10        because they are the ones who are

11        cooperating with the government.

12   Q.   And did Mr. Conception tell you how he

13        responded when he was asked about that?

14   A.   Yes.  Actually I think I was present

15        when that occurred.  And it was that he

16        was neither one, that he was just a cop.

17   Q.   How did Mr. Donato respond to that?

18   A.   I don't recall.

19   Q.   Now, do you remember -- did you ever

20        form any impression as to why Mr.

21        Conception would have thought that

22        it was his relationship with Mick Orr

23        that cost him his place on the task

24        force?

Page 761

1   A.  The environment had gotten kind of --

2       again this is my perspective.  But it

3       had gotten kind of ugly around there in

4       the sense that they had started going

5       around -- Donato had started going

6       around asking people if they were

7       insects or neatherd, which was one of

8       the first kind of signs.

9              And then just the

10      environment like I said just started

11      getting kind of hostile where certain

12      groups kind of felt like it was breaking

13      into teams, like those who were with

14      Donato and those who were with Mick Orr.

15      And if you were considered to be with

16      Mick Orr, Donato since he was the chief

17      there, would kind of harass you I guess

18      you could say. He was insulting people,

19      threatening people.  Myself I was at one

20      time threatened by Donato.

21   Q.  How were you threatened?

22   A.  He called me -- he had called Chris

23      Barfield, I think it was when he called

24      him the fucking gringo and Chris

1    Barfield asked him to stop I don't know

2    how many times.  And Donato -- no, what

3    it was was Donato had said -- called him

4    a gringo maricon.  And Chris had learned

5    to speak Spanish while he was here and

6    he knows that maricon means homosexual

7    or a better, I guess, translation would

8    be faggot.  It's derogatory.

9              And Chris Barfield had

10   told him, hey, I know what that means.

11   Don't call me that.  And Donato had made

12   some comment like, well, I'm glad you

13   know what it means, faggot, something

14   again.  That's not word for word but it

15   was to that effect.

16              Donato left and Chris

17   Barfield contacted EEO to file a

18   complaint.  Then, I don't know, a little

19   while later Donato came down to Chris

20   Barfield's desk and said I know what you

21   did and what you're doing and I'm going

22   to fuck you. I'm going to screw you for

23   that.  And I was in the area when he

24   said that.

1    Q.   So you heard that?

2    A.   Yes.

3    Q.   And you saw it?

4    A.   Yes.

5                   And so the way Donato

6         threatened me was when he found out

7         Chris called up and reported that

8         incident also, Donato called me to his

9         office and he gave me a -- it wasn't

10        a direct threat.  It was a hypothetical.

11        But I perceived it to be a threat.  He

12        gave me a hypothetical scenario.

13                   He said imagine there is

14        two gangs and the leader of one gang

15        what he wants to do is leave and take

16        his people with him.  What do you think

17        is going to happen to the people who

18        help him when they stay behind because

19        the leader of the opposing game is still

20        going to be there?

21                   And I took it that he was

22        referring to me, what's going to happen

23        me because I hadn't filed any

24        complaints.  I just kind of want to do

1          my job and stay out of this whole thing.

2          As a matter of fact even being here, as

3          Mr. Lazar knows, I tried my hardest --

4          and forgive me -- but to not be here

5          today.  It was a difficult time for me

6          to come here.  I just wanted to do my

7          job and stay out the whole thing.

8                          But I took that to mean

9          that even whether I liked it or not, I

10         was involved because I knew I was going

11         to be interviewed.  And Donato was kind

12         of telling me that if you help them and

13         you're not involved, you are still going

14         to be here when they leave.  And that

15         was the scenario he gave me. So what do

16         you think these other gangs are going to

17         do to you?

18    Q.   Can you attempt for me to place those

19         events that you just testified about in

20         time?

21    A.   Gosh, that was so long.

22    Q.   If I told you that Mick Orr returned

23         from a detail in Virgin Islands on March

24         27th of 2001 and that he -- I'm sorry,

Page 784

```
 1        something like that.  Something about --

 2        no, I haven't seen the letter.  So I

 3        can't say what's in the letter.

 4   Q.   How many individuals were on the

 5        Fugitive Task Force typically when you

 6        were there, approximately altogether?

 7   A.   I'd say hit or miss more or less 20

 8        people maybe. About 20 people more or

 9        less.

10   Q.   And is it your testimony that there was

11        some -- that all of the individuals on

12        the task force who were in some way

13        associated with Mick Orr were remove

14        from the task force?

15   A.   Absolutely, yes.

16   Q.   How would you characterize the kind of

17        association that one would have had to

18        have with Mick Orr in order to get

19        oneself fired?

20   A.   Friendly, sociable with Mick Orr or

21        eventually with myself, just a sociable,

22        friendly type relationship.  For

23        example, showing up at somebody's

24        birthday party or going jogging with
```

1    Q.    Do you recall exactly what was said

2          during the meeting that you just

3          referenced with Marshal Wirshing and

4          Mr. Donato?

5    A.    Word for word, no.  But I do remember --

6          and it's kind of what I mentioned

7          earlier about the way the Agency works,

8          is that whenever a position is opened,

9          anybody can apply for it.  And

10         apparently they have a history,

11         according to statements by Donato of a

12         position opening up, say an assistant

13         chief or a chief position or even a

14         deputy for that matter.  They come to

15         Puerto Rico and the first thing they

16         want to do is leave, and that they were

17         tired of that.  They were going to try

18         to keep those positions open for Puerto

19         Ricans.

20   Q.    And were you present to hear that

21         personally?

22   A.    Yes, I was.

23   Q.    Now, you said that you thought that

24         happened in '98 or '99.  Are you certain

Page 802

```
 1   Q.  Did you observe any demeanor in Mr. Orr

 2       in terms of a reaction to that

 3       situation?

 4   A.  Yes.  Again he was upset and felt bad.

 5       He also believed that it was because

 6       like they had warned Conception don't

 7       jog with him.  And Conception told him

 8       I'm not doing anything wrong.  I'm going

 9       to keep jogging.  And I think he felt

10       bad about that.

11   Q.  Did you ever observe if Mr. Orr had any

12       reaction to Miss Bermudas' situation?

13   A.  I believe I called -- I don't think he

14       was there when she was removed.  I think

15       he might have gone already.

16       But I know I told him on the phone and

17       he was upset.  But I can't remember if I

18       told him in person or on the phone, but

19       I do remember he was upset.

20   Q.  Did you ever learn if Miss Bermudas

21       applied for a job at the Marshal

22       Service?

23   A.  Yes.  She had been told that she was

24       going to be given the job what I spoke
```

1    A.   I would say, you know, they don't like

2         gringos here, that context.

3    Q.   Did you find it to be offensive?

4    A.   Yes, I find the word offensive.  Again

5         it can be used different ways but I

6         personally find the word offensive.

7    Q.   Did you ever hear Mickey Orr use the

8         word "gringo"?

9    A.   I've never heard him call anybody gringo

10        but I've heard him use the word

11        "gringo".  Maybe like they are calling

12        me gringo or should I be offended if

13        they call me gringo, that kind of

14        context.  But not to refer to somebody

15        as a gringo.

16   Q.   Did you ever see a license plate that he

17        had on his task force door that said

18        Gringo Number One?

19   A.   No, I've never seen it but I've heard

20        that he had one.  But I never saw it.

21   Q.   You never saw it.  But you heard he had

22        one?

23   A.   Somebody had said that -- I don't

24        remember.  Somebody had said that he had

Page 825

1   Q.  Is it your testimony Donato said that he

2       was going to work the system to ensure

3       that the non-Puerto Ricans were going to

4       be kept out of non-supervisory

5       positions?

6   A.  No, I think it was the Marshal who said

7       that.  I have to look at my notes of my

8       earlier deposition.

9   Q.  Did you take notes of that meeting at

10      the time?

11  A.  No, I did not.  When I say my notes I

12      mean the deposition that was given

13      recently after.

14             And I mean they both -- I

15      think the Marshal gave the speech.  But

16      then they were kind of backing each

17      other up back and forth as they were

18      speaking.  So the Marshal was the one

19      who started saying about working the

20      system and Juan Donato was telling about

21      how people come in and filling the spots

22      and then leave.

23  Q.  Now, how did Marshal Wirshing or Juan

24      Donato say they were going to work the

Page 842

1   A.   No.

2   Q.   Did you contact anybody in Headquarters

3        to see who canceled the announcement?

4   A.   No, I did not.

5   Q.   So it was just your impression but you

6        don't really have any facts to base it.

7        It's just your impression?

8   A.   Well, the facts that I have would be

9        that nobody else could do it except for

10       the Marshal in the District, unless I

11       guess Headquarters canceled it.  It was

12       either him or Headquarters.  It would be

13       one of the two.

14  Q.   So it's possible that Headquarters

15       canceled the announcement?

16  A.   It's possible.

17  Q.   It could happen?

18  A.   It could happen.

19  Q.   Is it your testimony that Conception was

20       removed from the task force?

21  A.   Yes.

22  Q.   And that he was removed by Donato?

23  A.   Yes.

24  Q.   Are you aware that -- were you

1      surprised?

2   A.  Not really.  We kind of saw it coming.

3       I mean Donato had made it pretty clear

4       that he was going to do something about

5       us.

6   Q.  Did you ever complain to Marshal

7       Wirshing about Conception being removed

8       from the task force?

9   A.  I did talk to Marshal Wirshing because

10      it was my belief that and my impression

11      -- that's why I went to him -- that

12      Donato may have been giving him

13      misinformation because the Marshal was

14      taking information from Donato.  And I

15      just wanted to plead Conception's case.

16  Q.  And basically what was the information

17      that Donato gave you?

18  A.  Well, basically that we were conspiring

19      against the Marshal.

20  Q.  And you went to the Marshal with that

21      information?

22  A.  And that it wasn't true, that we were

23      just trying to do our jobs, that there

24      was a war or whatever, that we just

Page 844

1           don't want to be a part of it.

2     Q.    And what was the Marshal's response?

3     A.    Stay out of it.  That's a good

4           philosophy.

5     Q.    Did he say he would look into it and get

6           back to you?

7     A.    No.

8     Q.    Now, when Conception was removed from

9           the task force was Mickie Orr in the

10          Virgin Islands or was he in Puerto Rico?

11    A.    Puerto Rico.  He was in Puerto Rico I

12          believe.

13    Q.    Did you actually see Mickie Orr in the

14          cell block, working in the cell block

15          when you were in Puerto Rico?

16    A.    No, I was in the task force at the time.

17    Q.    So you heard about it?

18    A.    Yes, everybody heard about it.

19    Q.    Did you actually see him transport a

20          prisoner while you were in Puerto Rico?

21    A.    No, again I was on the task force.

22    Q.    So everything you heard about?

23    A.    Yes.

24    Q.    So you have no firsthand knowledge?

1                    At that time Soto had

2      left.  So there was an opening for a

3      chief's job and that's when they gave

4      this speech.  So it just made sense.

5      There is an opening.  They are giving a

6      speech about what kind of person should

7      fill that opening.

8                    I put the two and two

9      together.  There is an opening and they

10     are giving a speech about who's going to

11     go up in the ranks at the same time.  So

12     it just made sense to me they were

13     talking about position.

14  Q.  Was there any kind of focus placed on

15     Mr. Donato during the meeting?

16  A.  Yes.  He was standing next to the

17     Marshal during the meeting.

18  Q.  And both of them were talking; is that

19     right?

20  A.  Both of them were talking, yes.

21  Q.  And the Marshal was it sounds like doing

22     more of the talking; is that right?

23        MR. LAZAR:  Objection, leading the

24     witness.  This is now redirect.

Page 858

1    Q.   Who did more of the talking?

2    A.   It was mostly the Marshal who started it

3         and gave most of the speech, afterwards

4         Donato kind of filled in some more.

5    Q.   And did you form an impression that

6         Marshal Wirshing was actually referring

7         to Mr. Donato when he explained what

8         kind of person he wanted to have fill

9         the position?

10   A.   In my impression, yes.  They were

11        talking about Donato becoming the chief.

12        That was my impression.

13   Q.   Was that impression right there at the

14        meeting as it was happening?

15   A.   Yes, it was.

16   Q.   And did that remain your impression as

17        you thought about it afterwards?

18   A.   Yes, when he became the chief.

19   Q.   So was your impression ever changed?

20   A.   Never.

21             MR. GOLDSMITH:  I don't have

22        anything else. Thank you.

23

24

1          IN THE UNITED STATES OF AMERICA

2      EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

3

4

5

6   EEOC NO. 160-A2-8082X

7   ----------------------------------------

8   MICHAEL ORR,

9   Complainant,

10

11  vs.

12

13  UNITED STATES MARSHAL SERVICE

14  Respondent.

15  ----------------------------------------

16

17

18              VOLUME III OF III

19          THURSDAY, August 19, 2004

20

21  BEFORE: THE HONORABLE ANA GONZALEZ

22  Equal Employment Opportunity Commission

23  525 F.D. Roosevelt Avenue, Suite 1202 San

24  Juan, Puerto Rico 00918

1          IN THE UNITED STATES OF AMERICA

2       EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

3

4

5

6    EEOC NO. 160-A2-8082X

7    ----------------------------------------

8    MICHAEL ORR,

9    Complainant,

10

11   vs.

12

13   UNITED STATES MARSHAL SERVICE

14   Respondent.

15   ----------------------------------------

16

17

18            VOLUME III OF III

19          THURSDAY, August 19, 2004

20

21   BEFORE: THE HONORABLE ANA GONZALEZ

22   Equal Employment Opportunity Commission

23   525 F.D. Roosevelt Avenue, Suite 1202 San

24   Juan, Puerto Rico 00918

1    Q.    What do you recall about being at task

2          force meetings with Mr. Wirshing and Mr.

3          Donato?

4    A.    There was one specific meeting which

5          stands out where, where I once had a

6          problem in the District where I wound up

7          filing a grievance.  And there was a

8          meeting that occurred where Marshal

9          Wirshing and Donato were present where

10         some comments were made which jumped out

11         at me and caught my attention.

12   Q.    What comments caught your attention?

13   A.    Well, it was a day -- I believe it was a

14         Friday at the task force where Juan

15         Donato began addressing the entire task

16         force.  And he made some comments to the

17         effect of we are going to have an

18         opening or we have an opening here for a

19         supervisor and we're going to ensure

20         this time that we make a proper

21         selection.  We are going to take care of

22         our own people.  We have some excellent

23         candidates here.  He went around the

24         task force and he mentioned a few people

1    by name.

2              And at some point

3    immediately afterwards Marshal Wirshing

4    jumped in and said what Donato is trying

5    to say is that we are sick and tired of

6    gringos coming down here and being

7    promoted and then leaving, his comments

8    were in Spanish he said "secando pecho",

9    which translates to with their chest

10   puffed out as if they had done something

11   great here.

12 Q.  And after he said that he was sick and

13     tired of gringos coming down here with

14     their chest pumped out you say?

15 A.  Puffed out.

16 Q.  Puffed out, did he say anything more?

17 A.  Not that I recall.

18 Q.  Now, Mr. Donato you said, said there

19     were some excellent people here and he

20     mentioned people by name.  Were you one

21     of the people that he mentioned by name?

22 A.  No, I was not.

23 Q.  Do you recall some of the people he

24     mentioned by name?

1  A.  Well, he said, Bobby, I think they set

2      me up.  They sent me to the Virgin

3      Islands and when I came back lo and

4      behold Juan Donato is the chief and I'm

5      the assistant chief.

6  Q.  Did you observe -- what did you observe

7      with regard to Mr. Orr's demeanor when

8      he told you that?

9  A.  He was not happy as I suspected.  No one

10     would be in that situation.

11  Q.  Did you -- when you say he was not

12     happy, what do you mean not happy?

13  A.  He was not happy.  He said, Bobby -- he

14     told me he felt bad.  He didn't know

15     what he was going to do.  He was

16     considering his options.  He felt

17     humiliated as anybody would be whose --

18     he got bypassed or not even bypassed.

19     He was a 14 and he got a Grade 13 being

20     his supervisor.  He didn't feel good.

21  Q.  By the way, with regard to the task

22     force meeting in March 2000, what

23     language was the meeting conducted in?

24  A.  Spanish.  I believe Donato started -- it

1    Q.   If Marshal Wirshing were to say that the

2         word "gringo" is not in his dictionary,

3         would that be a truthful statement?

4    A.   It's not in his dictionary?  I'm not

5         sure what you mean, Counselor.

6    Q.   You are certain that you heard the

7         Marshal use -- are you certain you heard

8         Marshal Wirshing use the word "gringo"

9         at that meeting?

10   A.   I'm certain, a hundred percent certain.

11   Q.   Have you ever heard Marshal Wirshing

12        make any references to God?

13   A.   Yes.

14   Q.   What reference have you heard him make

15        to God?

16   A.   I've heard him say I am like God here in

17        Puerto Rico.

18   Q.   Have you heard that once or more than

19        once?

20   A.   Once that I remember that stood out

21        because we talked about it afterward.

22   Q.   Who did you talk to about it?

23   A.   I talked to the other guys that were

24        present, Mike Earp who's in

Page 910

```
 1        Virgin Islands.

 2   Q.   And have you ever had an opportunity to

 3        discuss that at all with Mick Orr?

 4   A.   No.  No, I just never asked him, no.

 5        We've never talked about that.

 6   Q.   Now, with regard to your EEO complaint

 7        was Mick Orr mentioned in that

 8        complaint?

 9   A.   He may have been, yes, with the same

10        situation as far as me pointing out that

11        a 14 was being supervised or was a

12        subordinate of a 13.

13   Q.   Did you ever talk to Mick Orr about the

14        fact that he was being subordinated to

15        Juan Donato?

16   A.   Yes.

17   Q.   Do you recall what he might have said

18        about that?

19   A.   That it wasn't right.  That it wasn't

20        right.  I agreed with him.  I said I

21        don't know how they can get away with

22        this.

23   Q.   Did you ever have an opportunity to

24        observe or develop an impression of how
```

1      Mr. Orr felt about that?

2  A.  My opinion he just felt, he felt bad

3      about it just like anyone else would.

4      He felt terrible.  Nobody would

5      like to be put in that situation.

6          MR. GOLDSMITH:  That's all I have.

7

8                CROSS EXAMINATION

9

10     BY MR. LAZAR:

11 Q.  Mr. Sanchez, I believe you just

12     testified that you believe that you

13     mentioned Mr. Orr in your EEO complaint?

14 A.  Yes, sir.

15 Q.  You're certain of that?

16 A.  I'm not certain.  I believe I did.  I

17     haven't seen that paperwork in years.

18     But I believe that part of my grievance

19     was that what was going on that I was

20     not being treated fairly, and there were

21     others not being treated fairly; and

22     that possibly since I had heard some

23     comments, maybe it was because maybe we

24     were not native Puerto Ricans.

1    A.   He wanted to get out of Puerto Rico.

2    Q.   Did he say why he wanted to get out of

3         Puerto Rico?

4    A.   Because he was working in an hostile,

5         unpleasant environment.

6    Q.   And that's the reason he told you he

7         wanted to go to Michigan?

8    A.   Yes, sir.

9    Q.   Did he tell you that he put in for a job

10        in Headquarters, Marshal Service

11        Headquarters?

12   A.   No, I didn't know that.

13   Q.   Did he tell you he put in for a job in

14        the District of Florida?

15   A.   No, I didn't know that.

16   Q.   Now, when they had this task force

17        meeting that you testified about, I

18        believe it's your testimony that Mickie

19        Orr was in the Virgin Islands; isn't

20        that correct?

21   A.   I believe so.  I'm not a hundred

22        percent.  He wasn't at the meeting I

23        know that.

24   Q.   And it was also your testimony that to

Page 923

1   A.   He wanted to get out of Puerto Rico.

2   Q.   Did he say why he wanted to get out of

3        Puerto Rico?

4   A.   Because he was working in an hostile,

5        unpleasant environment.

6   Q.   And that's the reason he told you he

7        wanted to go to Michigan?

8   A.   Yes, sir.

9   Q.   Did he tell you that he put in for a job

10       in Headquarters, Marshal Service

11       Headquarters?

12  A.   No, I didn't know that.

13  Q.   Did he tell you he put in for a job in

14       the District of Florida?

15  A.   No, I didn't know that.

16  Q.   Now, when they had this task force

17       meeting that you testified about, I

18       believe it's your testimony that Mickie

19       Orr was in the Virgin Islands; isn't

20       that correct?

21  A.   I believe so.  I'm not a hundred

22       percent.  He wasn't at the meeting I

23       know that.

24  Q.   And it was also your testimony that to

1          their testimony in the record.  There

2          has been absolutely no evidence that Bob

3          Otto was promoted a year and a half

4          prior to this task force meeting.

5                MR. GOLDSMITH:  I'm going to put on

6          a rebuttal witness to this.  If he's

7          going to be able to use affidavits and

8          then be able to strike a live witness'

9          testimony on the same point, I'm going

10         to need to put on witnesses to rebut the

11         affidavits.

12               MR. LAZAR:  Well, the affidavit is

13         a part of the record and that's why they

14         didn't testify.  If there is something

15         outside of the affidavits, then that's a

16         little different.

17               THE COURT:  Is there anything on

18         the record about Bob Otto?

19               MR. GOLDSMITH:  I did not put in

20         the record the fact about Bob Otto's

21         promotion yet at this point and that's

22         why I'm now asking because he brought it

23         up.  I'm trying to --

24               THE COURT:  How did you phrase the

Page 935

1       Puerto Rico.  And I had already

2       approached Donato and said, hey, look, I

3       want to be considered for that one.  I

4       want to be given that opportunity or I'm

5       going to file a grievance.

6                   And then I went off to

7       Tampa.  While I was in Tampa that job

8       got selected or they put Raffi as the

9       acting supervisor.  And while I was

10      still there, because I was there for

11      like a six-week period, I was notified

12      that I had been selected for the Miami

13      job.  And I remember calling the

14      Marshal.

15  Q.  Which happened first, Mr. Escobar being

16      selected as the acting or you getting

17      the other job offer?

18  A.  Escobar getting selected first.

19  Q.  So is there any possibility in your mind

20      that you were not selected for the

21      acting chief in Puerto Rico because you

22      had been offered a job somewhere else?

23  A.  No, that didn't happen that way.  First

24      Raffi got the acting.  Immediately after

1       I got there, a week after, Raffi got

2       selected, and I remember not feeling too

3       happy about that.  And then towards the

4       end of my assignment I got selected for

5       that Miami job and I said I was not

6       going to file any grievance or anything.

7            MR. GOLDSMITH:  Thank you.  I have

8       no further questions right now.

9            MR. LAZAR:  I have nothing.

10           THE COURT:  You may be excused.

11      And your testimony is confidential.  So

12      please don't discuss it with anybody.

13               (Witness excused.)

14           THE COURT:  Could we just take five

15      minutes?

16                   (Recess)

17                (After Recess)

18

19           MR. GOLDSMITH:  At this time

20      Complainant moves that an exhibit, that

21      No. 27, Complainant's Exhibit 27 be

22      admitted into the record.  It's Mr.

23      Sanchez' complaint of discrimination

24      inclusive of his EEO counseling report.

Page 937

1     And it's being offered and admitted, as

2     I understand it, solely for the purpose

3     of indicating that Mr. Orr's name was

4     mentioned on the last page of the

5     counseling report.

6              Anybody have anything to

7     add to that?

8          MR. LAZAR:  No, Your Honor.

9          THE COURT:  Okay, admitted.

10    (Complainant's Exhibit No. 27 identified

11         and admitted int evidence.)

12

13         THE COURT:  So what I'd like is

14    closing briefs.  You can have closing

15    statements if you want to.  We certainly

16    have time now.  But I would like closing

17    briefs.  I don't know when the

18    transcript will be ready.  I can give

19    you some time after the transcript is

20    ready if that would be helpful to both

21    of you.

22         MR. LAZAR:  That will be fine.  I

23    know that with the mail situation, at

24    least with respect to the Marshal

Page 938

1      Service Headquarters getting mail, it is

2      common that there is delays.  So I guess

3      we can maybe, maybe we can sort of

4      certify a date that we agree that the

5      transcript has been received by everyone

6      and then we can sort of take a date

7      certain from that point.  Maybe we can

8      have a status call. Because the only

9      thing I'm concerned is if we say -- I

10     mean typically the transcript should be

11     ready I guess 10 days.

12         MR. GOLDSMITH:  If it's one more

13     week or whatever then it may make a

14     difference to everybody.  I don't have a

15     problem with that.

16         MR. LAZAR:  I think initially when

17     we talked I think we said like 30 days

18     after the transcripts are received.  If

19     we want to say 60 days, I don't have a

20     problem with that.

21         MR. GOLDSMITH:  I guess rather than

22     say that right now maybe we can do what

23     you suggested and see when we receive --

24         THE COURT:  When we receive the

1        transcript maybe we can have a short

2        conference call and then set it there.

3        Do you want to do that?

4             MR. LAZAR:  That would be

5        preferable.

6             THE COURT:  Because the transcript

7        can -- and nothing against the court

8        reporter, but I have had experiences

9        where the court reporter will say like a

10       week and it's a month.  So why don't we

11       just wait until everybody gets their

12       transcript and then that's --

13            MR. LAZAR:  I think that's good.

14       Because we've actually also had

15       experiences that we've gotten

16       transcripts without the exhibits

17       although we had a copy of the exhibits.

18       So I think that's a good idea.

19            THE COURT:  Okay, so we'll do that.

20       And so I declare this hearing closed

21       August the 19th.

22                  Thank you very much.

23              (Hearing Adjourned.)

24